211 N.J. Super. 1 (1986)
510 A.2d 681
STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT,
v.
ROBERT COOPER, DEFENDANT-APPELLANT.
STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT,
v.
WILLIE LEE LAWSON, DEFENDANT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Argued and Submitted April 7, 1986.
Decided May 27, 1986.
*5 Before Judges MORTON I. GREENBERG, J.H. COLEMAN and LONG.
Willard E. Byer, Jr., Designated Counsel, argued the cause for appellant Lawson.
Thomas S. Smith, Jr., Acting Public Defender, for defendant-appellant Cooper (Jack Gerber, Designated Counsel, of counsel and on the brief).
*6 W. Cary Edwards, Attorney General, attorney (Jeffrey L. Menkin, Deputy Attorney General, of counsel and on the brief).
The opinion of the court was delivered by LONG, J.A.D.
On these appeals, which have been consolidated for the purpose of this opinion, Willie Lee Lawson and Robert Cooper challenge their convictions for a series of crimes arising out of the robbery of the Howard Savings & Loan in Newark on November 28, 1980. During the course of the robbery Lawson shot and killed John Gottfried, a member of the Newark Police Department who was a customer at the bank.
The case arose on December 11, 1980 when the Essex County Grand Jury handed down a sixteen count indictment against Lawson and Cooper together with Daryl Benton, Alvin Conerly and Gina Woods. Lawson was named in the following counts of the indictment:
Count 1: Conspiracy to commit the November 28, 1980 robbery of the Howard Savings & Loan (N.J.S.A. 2C:5-2 and 2C:15-1).
Count 2: Robbery of the bank on November 28, 1980 (N.J.S.A. 2C:15-1).
Count 3: The murder of Officer Gottfried (N.J.S.A. 2C:11-3).
Count 4: Aggravated assault on Officer Gottfried (N.J.S.A. 2C:15-1).
Count 5: Robbery of Officer Gottfried (N.J.S.A. 2C:15-1).
Count 6: Receipt of stolen property (the get away car) (N.J.S.A. 2C:20-7).
Count 7: Unlawful possession of weapons used in the robbery (N.J.S.A. 2C:39-4(a)).
Count 8: Unlawful possession of handguns without a license (N.J.S.A. 39-5(b)).
Count 9: Unlawful possession of defaced firearms on December 6, 1980. (N.J.S.A. 2C:39-9(e)).
Count 10: Unlawful possession of automatic handguns without a permit on December 6, 1980 (N.J.S.A. 2C:39-5(b)).
Count 11: Unlawful possession of certain guns with intent to use them against others on December 6, 1980 (N.J.S.A. 2C:39-4(a)).
Cooper was named in the following counts which arose out of police activity following the initial crimes:
Count 13: Hindering apprehension and prosecution of another by concealing evidence (N.J.S.A. 2C:29-3(c)).
Count 14: Theft by receipt of stolen property, namely 2 handguns (N.J.S.A. 2C:20-7).

*7 Count 15: Unlawful possession of defaced weapons (N.J.S.A. 2C:39-9(e)).
Count 16: Possession of 3 revolvers (N.J.S.A. 2C:39-5(b)).
In a separate indictment (1657-80) Cooper was also charged, in connection with the events of November 28, 1980, with the murder of Gottfried (Count 1), possession of a handgun with intent to use it against Gottfried (Count 2), conspiracy to commit robbery (Count 3) and robbery (Count 4). Both Lawson and Cooper entered pleas of not guilty.
On August 21, 1981 Lawson and Cooper, along with 16 others, were named by the Grand Jury for the United States District Court, District of New Jersey in a 19 count indictment which charged the existence of a criminal conspiracy to commit and the commission of various robberies in violation of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961 et seq. (RICO) and with bank robbery in violation of 18 U.S.C. § 2113. Both Lawson and Cooper were found guilty of the federal charges on December 8, 1981.
They were then tried together in the Superior Court, Law Division, Essex County before Judge Martino and a jury. Prior to the trial, Lawson moved to suppress his statements to the police based upon an alleged violation of his rights under Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966) and to suppress other evidence seized as a result what he characterized as illegal police activity. These motions were denied as were motions by Cooper and Lawson to dismiss the indictments on double jeopardy grounds. A nine day trial, at which neither Lawson nor Cooper testified or presented a defense, ensued.
These facts were established at trial: The New World of Islaam is a black separatist para-military religious organization with branches in New Jersey, New York, Florida and South Carolina. The organization, whose primary occupation appears to be bank robbery, is structured along military lines with soldiers and officers as well as ministers who oversee the "religious" activities of the group. Cooper is a "minister" of the Newark branch of the New World and one of the organization's *8 highest ranking officers. Lawson is a "field agent" whose primary responsibility is fund raising for the organization by means of bank robbery. Lawson was supervised by Daryl Benton, a "captain" in the New World who was indicted by the Essex County Grand Jury but testified for the State pursuant to a plea bargain.
On November 28, 1980 Cooper ordered Benton to rob the Howard Savings Bank in Newark along with Lawson and Derrick Edmundson, who was a minor and another soldier in the cause. These four met at the apartment of Alvin Conerly, an "acting minister," to discuss the plans for the robbery: Cooper told the others how the job was to be done and what their roles would be; he also indicated that it would be an easy job since the New Brunswick branch of the New World had successfully robbed the same bank the month before.
On the night before the planned date of the robbery the group met again at Conerly's apartment and Cooper delivered guns to the participants. He also made certain they had extra clothes to change into, fingernail polish which they put on their fingertips to prevent leaving identifiable fingerprints and stocking masks to obscure their features. Cooper told Conerly to wait at the prearranged point to pick up the money and weapons following the robbery. On Wednesday, November 26, the group set off to rob the bank but decided "it didn't look right" and the operation was postponed.
On Friday, November 28, the participants met again at which time Cooper gave them guns and a plastic bag in which to put the money. When they drove to the bank Lawson asked Benton if he should "go in and get the drop on the guard" to which Benton replied it was up to Lawson to decide. While Benton finished parking the car, Lawson and Edmundson entered the bank. Lawson, who was laughing and smiling, waved a gun at the guard and ordered everyone to lie down on the floor while Edmundson jumped over the counter to collect the money. One of the customers in the bank was an off-duty *9 police officer, John Gottfried, who was wearing his uniform at the time. Lawson then went over to Gottfried, who was lying on the floor with the other customers, and emptied his gun into the officer. Lawson continued to fire the gun after it was empty, and then kicked the body and cursed at it. Benton arrived at the scene at this point and saw Lawson shooting. When the gun was empty Lawson reached down and took Gottfried's gun and fired at least three more shots. At some point Gottfried managed to fire one shot at Lawson which struck him in the leg. The three robbers then fled the scene. The entire holdup was filmed by the bank's security video equipment. The robbers dropped off the money and guns with Conerly as arranged and abandoned the car (which had been stolen). Gottfried died from the gunshot wounds.
Benton was eventually apprehended by the F.B.I. and local police in Jacksonville, Florida together with Conerly. Cooper was arrested when the police, who had gone to a Newark address in search of Edmundson, observed Cooper come out of a fifth floor apartment and place a plastic bag on the stairs to the sixth floor and return to the apartment, all apparently without noticing the police on the stairs below. The police, after checking the bag, discovered it contained three handguns later identified as taken from guards in other robberies, and arrested Cooper.
After the robbery, Edmundson, who was then fifteen, was reported to the police as a delinquent. When the police checked with his mother, she informed them that he had been missing for several days. The police also received a tip that Edmundson was a member of the New World and could be found at Conerly's apartment, 806 South 13th Street, Newark. The investigating officers knew that an unidentified juvenile had been involved in the robbery on November 28. Based on this information in the early morning of December 6, eight police officers went to Conerly's apartment, in which they knew Conerly's common-law wife, Gina Woods, and several children also lived.
*10 Because the police suspected that Edmundson had been involved in the robbery, four of the police went up to the apartment. When the police arrived at Conerly's apartment they knocked and a woman asked who they were. They identified themselves as police officers and asked if she would open the door so they could speak with her. They then heard some movement in the apartment and the woman said, "It's the police. Get rid of the guns, get rid of the guns." The police then demanded entrance and once the door was opened they entered and fanned out in the apartment, fleetingly observing someone running into a closet. They opened the closet door which was slightly ajar and saw a youth huddled on the floor. They discovered that this was Edmundson and then observed what appeared to be a .25 caliber automatic on the floor near the closet. Another policeman went into the bathroom and found Lawson dressed in pajamas. In a box in the living room the police found medical supplies, bandages and bloodstained dressings. Because they had heard the word "guns" and because of the other things they had found in the apartment, two of the policemen remained at the scene with Ms. Woods and the children while the others took Lawson to police headquarters and Edmundson to the juvenile authorities. These officers then obtained a search warrant and informed the officers at the apartment to proceed with a search. The search turned up a .38 caliber revolver, several boxes of ammunition, a .22 caliber Winchester rifle, tools used to steal cars, and some ski masks and knit hats. Lawson was arrested for harboring a juvenile and possession of a weapon.
Detective John Scott-bey, a member of the Newark Police Department, was involved with the Task Force investigating the death of Officer Gottfried. On the morning of December 6, he arrived at the station. Scott-bey knew that at least one juvenile had been involved in the robbery; he also knew that a raid had taken place the previous night. He was acquainted with Edmundson through his usual assignment with the juvenile bureau and spoke with him briefly upon his arrival at the *11 station. He noticed the bandages seized at Conerly's and asked Edmundson if he was wounded. He then noticed Lawson seated across the room and started talking to him. He verbally informed Lawson of his Miranda rights and asked if he understood them; Lawson said he did. Scott-bey then asked Lawson if he was willing to talk to which Lawson replied that he would talk but he wasn't going to sign anything. Scott-bey then asked him if he was wounded to which Lawson replied that he wasn't. Scott-bey, who had noticed a sizeable bulge under Lawson's pants, patted him down and discovered a poorly bandaged wound. Upon Lawson's request, he changed the bandage and told him it appeared to be a gunshot wound. Lawson then said, "You know I'm your man, I'm the one you're looking for." Scott-bey asked him what had happened and Lawson gave him a somewhat garbled version of the shooting which Scott-bey wrote down. Scott-bey then turned Lawson, the Miranda warning and Scott-bey's transcription of Lawson's statement over to Detective Goodwyn, the head co-ordinating investigator of the Task Force.
Goodwyn then spoke with Lawson briefly and Lawson repeated what he had told Scott-bey. Lawson then agreed to give a written statement. Goodwyn informed Lawson of his rights and gave him a written Miranda form which Lawson signed. Goodwyn then typed a question and answer format statement and gave it to Lawson to review; Lawson made some changes on it, signed it and it was witnessed by another officer present.
Later that day, due to other information received by the police, Goodwyn, together with Detective DeMasi, took another statement from Lawson; this was preceded by a Miranda statement form which Lawson signed. Another statement, following the same procedure, was taken on December 7. Goodwyn's formal report did not refer to the statement given to Scott-bey because, he testified, it contained the same information as the signed statement Lawson had given him and because he thought that the Scott-bey statement, which was unsigned, was of no value. Judge Martino found that Lawson *12 received Miranda warnings which he voluntarily and knowingly waived and that the statements were admissible.
The relevant portions of these statements which were read to the jury are as follows:
I went in the bank, I pointed the gun at the guard and asked him to lay down. He layed down. I asked another black male to lay down. He did. Then I notice Gotfried, I know his name from the paper. I told him to lay down. He made motions to lay but he didn't. At that time I glanced away from him to see other movement. I glanced out the corner of my eye and again I told him to lay down. After he wouldn't lay down I noticed he was reaching. He came out and he fired. I felt a sharp pain. I fired back, I fired two shots. After I fired two shots he fell. When he fell I walked over to his gun. He made motions to fire again, he wasn't really dead. When he swung his arm up I dived over. When I dived over I fired, I think three more shots. After I fired he slumped over with his gun hand open. I jumped on him. He wasn't really dead, but I guess he was going. The gun was pointing at a woman's head so I wrestled the gun out of his hand. I fired one shot from his gun then I jumped off him and ran to the door. Me and the other guys fled from the bank.
Lawson moved for acquittal on all counts and particularly on counts nine, ten and eleven relating to illegal possession of weapons on December 6, the date of his arrest. He claimed to have been a bystander in Conerly's apartment and that there was no evidence connecting him to illegal possession of any of the weapons seized at that time. The court denied the motions on the basis that the jury could find him guilty beyond a reasonable doubt on each of the crimes charged. Thereafter Lawson and Cooper were found guilty of all charges.
Lawson was sentenced on May 26, 1983. The judge merged the conspiracy charge (Count 1) into the robbery charge (Count 2); the charges of possession of weapons for an unlawful purpose (Count 7) and robbery from Officer Gottfried (Count 5) were also merged into the robbery charge (Count 2). Lawson received a life sentence for murder with a 25 year period of parole ineligibility (Count 3); 50 years for armed robbery (Count 2); 14 years for aggravated assault (Count 4); 7 years for unlawful possession of a weapon (Count 8); 1 year for possession of defaced weapons (Count 9); 7 years for possession of weapons without a permit (Count 10), 14 years for second degree possession of weapons with intent to use them *13 unlawfully (Count 11) and 7 years for receipt of stolen property (Count 6), all of which were to run consecutive to each other.
On November 14, 1983 Lawson was resentenced on certain counts: he received 10 years for aggravated assault (Count 4), 5 years for receipt of stolen property (Count 6), 5 years for possession of a gun without a permit (Count 8), 5 years for possession of a weapon without a permit (Count 10) and 10 years for possession of a weapon with intent to use it against another (Count 11). These sentences were to be served consecutively to each other and to the remaining unchanged sentences. Lawson also received an appropriate Violent Crimes Compensation Board Penalty.
Cooper was sentenced as follows: On Indictment Number 1657-80, murder, life imprisonment with a parole ineligibility term of 25 years, to be served consecutively to any other custodial sentence he was then serving (count 1). Counts 2, 3 and 4 were merged with count 1 for sentencing purposes. On Indictment Number 1095-80 Cooper received the following sentence: hindering apprehension of another, eight years imprisonment, consecutive to the sentence imposed on Indictment Number 1657-80 (count 13); receiving stolen property, eight years imprisonment, consecutive to count 13 (count 14); possession of a defaced weapon, one year imprisonment, consecutive to count fourteen (count 15); unlawful possession of two handguns, eight years imprisonment, consecutive to count fifteen (count 16). Cooper was assessed an appropriate Violent Crimes Compensation penalty on each of these indictments.
These appeals ensued in which Lawson claims that the following errors warrant reversal:
Point I The instant prosecution for conspiracy to rob the bank and the robbery itself violated N.J.S.A. 2C:1-11 double jeopardy.
Point II The lower court improperly denied defendant's motions to suppress evidence seized from 806 South 13th Street and the confessions given by him to the police.
(A) 806 South 13th Street
(B) Confessions

*14 Point III The lower court erred in denying defendant's motion that the charge of possession of a handgun merged into the charge of armed robbery.
Point IV The trial court improperly determined that the statements elicited by the defendant were voluntary.
Point V The charges of possession of a handgun without a permit and possession of a handgun for an unlawful purpose on December 6th, merged.
Point VI The lower court improperly denied defendant's motion for acquittal on counts 8 and 9 of the indictment.
Point VII The lower court erred in denying defendant's motion to dismiss count 11 of the indictment.
Point VIII The sentences imposed upon defendant were excessive.
Cooper raises a single point on appeal, identical to Lawson's primary claim:
The instant prosecution for conspiracy to rob the bank in Newark and the robbery itself violated N.J.S.A. 2C:1-11 (double jeopardy).
We have canvassed this record with care and find that these contentions are without merit.
We turn first to the statutory double jeopardy claim.[1] Lawson and Cooper were convicted in federal court of conspiring and participating in an enterprise engaged in racketeering activity (Count I). Count II, of which they were also convicted, charged that defendants
... being associated with an enterprise the activities of which affected interstate commerce, did knowingly, willfully and unlawfully conduct and participate directly and indirectly in the conduct of the affairs of the enterprise through a pattern of racketeering activity, as defined by Title 18, United States Code, Section 1961 (5), in that the defendants did commit, attempt to commit, and aid, promote, facilitate and solicit the commission and planning of multiple violations of New Jersey Statutes involving armed robbery, in which the defendants knowingly and willfully would, in the course of committing thefts and while armed with dangerous weapons, purposely put others in fear of immediate bodily injury, in violation of New Jersey statutes 2C:15-1; 2C:2-6 and 2C:5-2 as set forth below: ...
*15 Count II of the indictment then generally listed 17 separate bank robberies, including that of the Howard Savings & Loan on November 28, 1980. The remaining counts of the indictment specifically charged various defendants with particular acts of robbery and assault during bank robberies. The November 28, 1980 robbery involved in this appeal is not one of the specific enumerated acts of robbery for which defendants were convicted.
Lawson and Cooper contend that under N.J.S.A. 2C:1-11 their convictions on Count II of the federal indictment bars their subsequent state prosecution for the November 28 robbery of the Howard Savings & Loan. This statute provides in pertinent part that:
When conduct constitutes an offense within the concurrent jurisdiction of this State and of the United States, a prosecution in the District Court of the United States is a bar to a subsequent prosecution in this State under the following circumstances:
a. The first prosecution resulted in an acquittal or in a conviction, or in an improper termination as defined in section 2C:2-9 and the subsequent prosecution is based on the same conduct, unless (1) the offense of which the defendant was formerly convicted or acquitted and the offense for which he is subsequently prosecuted each requires proof of a fact not required by the other and the law defining each of such offenses is intended to prevent a substantially different harm or evil or (2) the offense for which the defendant is subsequently prosecuted is intended to prevent a substantially more serious harm or evil than the offense of which he was formerly convicted or acquitted or (3) the second offense was not consummated when the former trial began; ...
The statute, which is derived from the Model Penal Code, is essentially a codification of the test announced in Blockburger v. United States, 284 U.S. 299, 52 S.Ct. 180, 76 L.Ed. 306 (1932). State v. Di Ventura, 187 N.J. Super. 165, 170 (App.Div. 1982), certif. den. 93 N.J. 261 (1983). In Blockburger, the United States Supreme Court held that:
The applicable rule is that where the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of an additional fact which the other does not.... A single act may be an offense against two statutes; and if each statute requires proof of an additional fact which the other does not, an acquittal or conviction under either *16 statute does not exempt the defendant from prosecution and punishment under the other. [284 U.S. at 304, 52 S.Ct. 182; citations omitted].
Under Blockburger the term "fact" refers to an element of the offense: so long as there is an additional element in one offense not present in the other the Model Penal Code principle enunciated in Blockburger and codified in N.J.S.A. 2C:1-11 is satisfied. State v. Di Ventura, supra, 187 N.J. Super. at 170-171 (citing Illinois v. Vitale, 447 U.S. 410, 100 S.Ct. 2260, 65 L.Ed.2d 228 (1980)).
The relevant sections of RICO, 18 U.S.C. § 1962 provide that:
(c) It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.
(d) It shall be unlawful for any person to conspire to violate any of the provisions of subsections (a), (b), or (c) of this section.
Racketeering activity includes any act or threat involving robbery, 18 U.S.C. § 1961(1)(A), and a pattern of racketeering activity requires the commission of at least two acts of racketeering, 18 U.S.C. § 1961(5). Defendants were convicted of violating the substantive RICO provisions. The prohibited act under RICO is participation in an enterprise that engages in a pattern of racketeering activity:
In order to secure a conviction under RICO, the Government must prove both the existence of an `enterprise' and the connected `pattern of racketeering activity.' The enterprise is an entity, for present purposes a group of persons associated together for a common purpose of engaging in a course of conduct. The pattern of racketeering activity is, on the other hand, a series of criminal acts as defined by the statute. [citation omitted] The former is proved by evidence of an ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit. The latter is proved by evidence of the requisite number of acts of racketeering committed by the participants in the enterprise. While the proof used to establish these separate elements may in particular cases coalesce, proof of one does not necessarily establish the other. The `enterprise' is not the `pattern of racketeering activity'; it is an entity separate and apart from the pattern of activity in which it engages. The existence of an enterprise at all times remains a separate element which must be proved by the Government. [United States v. Turkette, *17 452 U.S. 576, 583, 101 S.Ct. 2524, 2528, 69 L.Ed.2d 246 (1981); footnote omitted].
"Thus, it is neither the enterprise standing alone nor the pattern of racketeering activity by itself which RICO criminalizes. Rather, the combination of these two elements is the object of punishment under RICO." United States v. Russotti, 717 F.2d 27, 33 (2 Cir.1983), cert. den. 465 U.S. 1022, 104 S.Ct. 1273, 79 L.Ed.2d 678 (1984).
The gist of Lawson and Cooper's claim here is that because the November 28, 1980 robbery was listed as one of the acts of racketeering under the second RICO count, they were actually convicted of that robbery. There is nothing in the record to support this contention. The fact of the matter is that although Lawson and Cooper were convicted of other robberies and assaults, they were not convicted in federal court of the robbery on November 28, of conspiracy to commit that robbery or of aggravated assault in the course of that robbery. They were convicted of conspiracy to violate the provisions of RICO which required proof of only two of the predicate acts. Here Lawson and Cooper were convicted of eight predicate acts in the other counts of the federal indictment. None of those convictions related to the November 28, 1980 robbery. There is, therefore, nothing in this record which would indicate, purely from a fairness point of view, that defendants were required to defend themselves twice for the same offense or that the same evidence was used to support the RICO conviction and the subsequent state convictions. It is the unfairness of this same evidence which underlies the statutory policy of double jeopardy and which is lacking in this case. See, e.g., State v. Currie, 41 N.J. 531 (1964).
Moreover, the federal convictions for violation of the substantive RICO provisions and conviction for the predicate acts does not offend the constitutional principle of double jeopardy. Thus, even though defendants were separately convicted of robbery and assault in counts 3-19 of the federal indictment and these acts were separately named in the substantive *18 RICO count, there was no double jeopardy within the federal indictment: a defendant can be convicted and separately punished both for the predicate offenses and for the substantive RICO violation without running afoul of the Double Jeopardy Clause. E.g., United States v. Solano, 605 F.2d 1141 (9 Cir.1979), cert. den. 444 U.S. 1020, 100 S.Ct. 677, 62 L.Ed.2d 652 (1980); United States v. Aleman, 609 F.2d 298 (7 Cir.1979), cert. den. 445 U.S. 946, 100 S.Ct. 1345, 63 L.Ed.2d 780 (1980); and see United States v. Sutton, 700 F.2d 1078, 1081 (6 Cir.1983) (clear legislative intent of RICO is to permit, even to encourage, the imposition of cumulative sentences for RICO offenses and the underlying crimes). Clearly then, if defendants could be convicted separately in the federal court of both the substantive RICO violation and of the predicate acts, there is no reason why they could not be convicted of the substantive RICO violation in federal court and one of the predicate acts in state court.
Similarly, there is no statutory jeopardy on the conspiracy counts. The RICO conspiracy conviction involved proof of different and additional facts than those required for the conspiracy to rob the bank underlying this appeal. "[T]he subject of a RICO conspiracy is to violate a substantive RICO provision  here, to conduct or participate in the affairs of an enterprise through a pattern of racketeering activity  and not merely to commit each of the predicate crimes necessary to demonstrate a pattern of racketeering activity." United States v. Elliott, 571 F.2d 880, 902 (5 Cir.1978), cert. den. 439 U.S. 953, 99 S.Ct. 349, 58 L.Ed.2d 344 (1978) See United States v. Phillips, 664 F.2d 971 (5 Cir.1981), cert. den. 457 U.S. 1136, 102 S.Ct. 2965, 73 L.Ed.2d 1354 (1982).
It is clear, therefore, that the prior convictions for the substantive RICO violations require proof of facts not required for the state convictions, thus meeting the first requirement of N.J.S.A. 2C:1-11(a)(1). The law defining these offenses must additionally be "intended to prevent a substantially different *19 harm or evil." Id. The legislative purpose of RICO as stated in section 1 of P.L. 91-452 is as follows:
It is the purpose of this Act to seek the eradication of organized crime in the United States by strengthening the legal tools in the evidence gathering process, by establishing new penal prohibitions, and by providing enhanced sanctions and new remedies to deal with the unlawful activities of those engaged in organized crime. [Organized Crime Control Act of 1970, Statement of Findings and Purpose, 84 Stat. 922-923, reprinted in (1970) U.S.Code Cong. & Admin. News, at 1073].
Obviously this is a substantially different evil than that underlying prosecution for robbery itself. Defendants' convictions under RICO did not bar their subsequent state court prosecutions and their motion to dismiss the indictments was properly denied.
Lawson next argues that the police lacked a legitimate purpose to justify their presence at Conerly's apartment without an arrest warrant and that therefore any evidence seized, as well as Lawson's confession, should be suppressed as fruit of the poisonous tree. We disagree. The police went to Conerly's apartment on the tip that Edmundson, a minor, might be found there. N.J.S.A. 2A:4A-31 provides that a juvenile may be taken into custody without a warrant for delinquency or when it is necessary to protect the health and safety of the juvenile or when the juvenile has left home without parental consent. R. 5:8-2, then in effect, (now R. 5:21-1) provides that a law enforcement officer may take into custody, without process, any juvenile whom the officer has probable cause to believe is delinquent or in need of supervision and that such custody shall not be construed as an arrest but a measure to protect the health, morals and well-being of the juvenile. The presence of the police was, therefore, completely justifiable.
The situation is also distinguishable from that in Steagald v. United States, 451 U.S. 204, 101 S.Ct. 1642, 68 L.Ed.2d 38 (1981) upon which Lawson relies heavily. In that case, the police went to a private home on a tip that a federal fugitive wanted on drug charges was staying there. Armed with a six month old arrest warrant for the fugitive, the police searched *20 the house, uncovering 43 pounds of cocaine. The Supreme Court held that in the absence of consent or exigent circumstances the arrest warrant was insufficient to justify the search of a third person's home. Id. at 212-214, 101 S.Ct. at 1647-1648. In the present case, the police had justifiable cause to be at the Conerly apartment and once there the statement "get rid of the guns" provided them with sufficient justification to take emergency measures to protect themselves. It is worth noting that unlike Steagald in which the police searched the entire house based on the outstanding arrest warrant, in this case all the police did was fan out through the apartment and open the closet door, already ajar, when they had seen someone going into it. It was at this point that they saw a gun, in plain view, on the floor next to the closet. The bandages were also in plain view in the living room. It is also noteworthy that Lawson does not contest the validity of subsequent search pursuant to a warrant or the admissibility of the evidence uncovered in that search.
He does contend however that the holding in Payton v. New York, 445 U.S. 573, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980) required the police to secure an arrest warrant for Edmundson because he was a felony suspect. But Payton did not involve a juvenile or the particularized rules governing juveniles, nor did the Supreme Court address the question of the need to obtain a warrant before going to a home to question the occupants concerning the whereabouts of the delinquent. In addition, the Supreme Court in Payton expressly declined to rule on whether exigent circumstances might have justified the searches involved since, unlike the situation here, the lower courts had not relied on that justification. Id. at 583, 100 S.Ct. at 1378.
Lawson also contends that the claim that the police sought Edmundson as a delinquent juvenile was mere subterfuge since they clearly felt he was a felony suspect and had sufficient time to secure a warrant to search the premises. Clearly, however, the search and seizure was objectively reasonable *21 and this is all that is required regardless of the subjective motives of the police. State v. Bruzzese, 94 N.J. 210, 219-223 (1983).
Indeed, it is somewhat difficult to understand exactly what Lawson claims to have been illegal here. The bandages were in plain view in the living room; the gun was on the floor by the closet in which the police found Edmundson and was validly seized as evidence within the immediate vicinity of Edmundson. The police did not extend the search beyond the scope necessary to secure their own safety nor did the scope extend beyond that which provided sufficient probable cause based on their observations at the scene. State v. Young, 87 N.J. 132, 143-144 (1981). Seizure of the gun was clearly justifiable. See Adams v. Williams, 407 U.S. 143, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972); Chimel v. California, 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969); Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). Thus the search was valid and therefore the evidence was admissible, including Lawson's subsequent confession.
In this connection Lawson urges that the police lacked probable cause to arrest him for possession of a weapon and/or harboring a juvenile, and therefore his confession was tainted. The gist of this argument is that there was no proof that he resided in the apartment. In support, he advances the incredible proposition that his presence there dressed in pajamas at 1:00 a.m. with large quantities of bandages covered with his blood found in the living room supports the view that he was merely there by chance. He also contends that there is nothing illegal in possessing a gun and that the circumstances did not justify his detention for possession. In light of the condition in which the gun was found  with tape over the handle and the serial number removed  and the fact that by definition no one may legally possess a defaced weapon (N.J.S.A. 2C:39-5; -9), the police had ample reason to detain Lawson.
*22 Lawson next argues that his statement to Detective Scott-bey that he would not sign any statement renders his subsequent confession inadmissible. But Lawson subsequently signed three separate properly administered Miranda waivers on three separate occasions with respect to which there is no hint in the record of impropriety. Important in this regard is Lawson's familiarity with the criminal justice system. He has several prior convictions; he is not a novice to the process; and there is nothing in this record to support a suggestion of any impairment of his comprehension of the meaning of the situation. The fact that Lawson stated he would not sign anything did not prevent him from thereafter voluntarily waiving his rights, and this record would not support a finding of manipulative, deceptive or coercive conduct by the police of the type Miranda was intended to protect against. State v. Graham, 59 N.J. 366, 376-377 (1971). Lawson's statements were, therefore, correctly deemed admissible.
Lawson next raises two merger claims. The first is that his conviction for possession of a gun without a permit merged with the conviction for armed robbery. We disagree. The proofs required to support a conviction for possession of a handgun without a permit require only knowing possession of the gun without having first acquired a permit, N.J.S.A. 2C:39-5(b). It is well-settled that this is an offense separate and apart from that of armed robbery; the two offenses simply do not merge. E.g., State v. Pratts, 145 N.J. Super. 79, 97 (App.Div. 1975), aff'd 71 N.J. 399 (1975); State v. Tumbiolo, 28 N.J. Super. 231 (App.Div. 1953), certif. den. 14 N.J. 495 (1954). See also State v. Best, 70 N.J. 56, 66-67 (1976).
Lawson's position that possession of a handgun without a permit is an integral part of possession for an unlawful purpose and therefore his conviction on those charges for the December 6 incident should have been merged is likewise meritless. The gravamen of an offense under N.J.S.A. 2C:39-5(b) is the failure to have a permit while that of N.J.S.A. *23 2C:39-4(a) is possession of a weapon with the intent to use it unlawfully. These are not included offenses within the meaning of N.J.S.A. 2C:1-8(d) and do not merge. State v. Latimore, 197 N.J. Super. 197, 215-216 (App.Div. 1984).
We also reject Lawson's claim that the trial judge erred in the denial of his motion for acquittal on the counts relating to his possession of weapons at the time of his arrest at Conerly's apartment on December 6, 1980. The test applied to a motion for acquittal is
... [w]hether, viewing the State's evidence in its entirety, be that evidence direct or circumstantial, and giving the State the benefit of all its favorable testimony as well as all of the favorable inferences which reasonably could be drawn therefrom, a reasonable jury could find guilt of the charge beyond a reasonable doubt. [State v. Brown, 80 N.J. 587, 591 (1979), citing with approval State v. Reyes, 50 N.J. 454, 459 (1971)].
The State's evidence in this case amply demonstrated that Lawson was part of the New World, that he participated in the robbery, that he had been given weapons on several occasions by Cooper at Conerly's apartment and that he was found at Conerly's apartment on December 6, 1980 at which time the police also uncovered three weapons, two of which were defaced, and a cache of ammunition. There was also ample evidence which would support a finding beyond a reasonable doubt by a reasonable jury that Lawson had the capacity to exercise control over these weapons and the intent to use them unlawfully. There was, additionally, evidence which would support a finding of constructive possession by Lawson of the weapons. That is all that is required. 80 N.J. at 597. In sum, the denial of Lawson's motion was eminently correct.
We turn finally to Lawson's claim as to the excessiveness of his sentence. Although his brief alleges that he received two extended terms which would contravene N.J.S.A. 2C:44-5(a)(3), in fact the only extended term imposed was on the 50 year armed robbery count. Beyond this, his only other *24 claim appears to be that he was an orphan. This is patently insufficient to outweigh the trial judge's findings as to the heinousness of the offenses involved (N.J.S.A. 2C:44-1(a)(1)); the fact that Lawson's criminality was of an organized nature (N.J.S.A. 2C:44-1(a)(5)); that he played a major role in these offenses (N.J.S.A. 2C:44-1(a)(1)); that it was likely that he would commit another offense and required deterrence (N.J.S.A. 2C:44-1(a)(3) and N.J.S.A. 2C:44-1(a)(9)), and that he had a substantial prior criminal record (N.J.S.A. 2C:44-1(a)(6)). Clearly, as the trial judge found, the preponderance of aggravating factors far outweighed whatever mitigating factors were present in this case. He thus imposed an extended term of imprisonment on count two, and the maximum penalty permissible on counts three, four, six, eight, ten and eleven. See N.J.S.A. 2C:43-7(a); N.J.S.A. 2C:43-6(a). These sentences are reasonable, appropriate, and fully justified by the record. State v. Roth, 95 N.J. 334 (1984); State v. Hodge, 95 N.J. 369 (1984).
The only substantial question raised by this sentence was not raised by the defendant: does it violate the principle announced in State v. Yarbough, 100 N.J. 627, 644 (1985) that "there should be an overall outer limit on the cumulation of consecutive sentences for multiple offenses not to exceed the sum of the longest terms (including an extended term, if eligible) that could be imposed for the two most serious offenses." Lawson received a life term with 25 years of parole ineligibility for murder. This is not an extended term under N.J.S.A. 2C:11-3. It is a viable "`ordinary' sentence." State v. Serrone, 95 N.J. 23 (1983). The next most serious offense of which Lawson was convicted was armed robbery (N.J.S.A. 2C:15-1) for which he could have received an extended term under N.J.S.A. 2C:43-7 of life imprisonment with 25 years of parole ineligibility. Thus, theoretically, Lawson could have received two life sentences with 50 years of parole ineligibility *25 without violating Yarbough. Instead he received a life sentence with 25 years of parole ineligibility plus 86 years. Under N.J.S.A. 30:4-123.51(a) Lawson would be primarily eligible for parole on the 86 year sentence after serving 1/3 of the sentence or 28 and 2/3 years less commutation time. However, N.J.S.A. 30:4-123.51(b) provides that:
Each adult inmate sentenced to a term of life imprisonment shall become primarily eligible for parole after having served any judicial or statutory mandatory minimum term, or 25 years where no mandatory minimum term has been imposed less commutation time for good behavior and credits for diligent application to work and other institutional assignments. If an inmate sentenced to a specific term or terms of years is eligible for parole on a date later than the date upon which he would be eligible if a life sentence had been imposed, then in such case the inmate shall be eligible for parole after having served 25 years, less commutation time for good behavior and credits for diligent application to work and other institutional assignments. Consistent with the provisions of the New Jersey Code of Criminal Justice (N.J.S. 2C:11-3, 2C:14-6, 2C:43-6, 2C:43-7), commutation and work credits shall not in any way reduce any judicial or statutory mandatory minimum term and such credits accrued shall only be awarded subsequent to the expiration of the term. [Emphasis added]
Thus Lawson will be eligible for parole on the 86 year sentence after serving 25 years less commutation credits. Accordingly the sentence imposed in this case does not violate Yarbough since it is the same as the sum of the longest terms (including an extended term) which could be imposed for Lawson's two most serious offenses, murder and armed robbery. As has been noted, the sum of those terms would be two life sentences with fifty years of parole ineligibility. Because Lawson could have received two life sentences each bearing a 25 year parole disqualifier, the full 50 years would have to be served prior to parole eligibility. With the actual sentence imposed here, Lawson will have to serve the full mandatory minimum for murder or 25 years, plus 25 years on the 86 aggregated term which will be reduced by commutation time. Thus Lawson's effective sentence here is less than the Yarbough maximum. There is no reason for us to interfere with this sentence.
Affirmed.
NOTES
[1] The only jeopardy claim available to Lawson and Cooper is statutory since constitutional double jeopardy is implicated only when a single sovereign is involved. Where the same act constitutes an offense in two or more jurisdictions, jeopardy in one jurisdiction is no bar to jeopardy in another. Bartkus v. Illinois, 359 U.S. 121, 79 S.Ct. 676, 3 L.Ed.2d 684 (1959); State v. Cooper, 54 N.J. 330 (1969) cert. den. 396 U.S. 1021, 90 S.Ct. 593, 24 L.Ed.2d 514 (1970); and see State v. Goodman, 92 N.J. 43 (1983).