739 A.2d 455 (1999)
325 N.J. Super. 376
STATE of New Jersey, Plaintiff-Respondent,
v.
Gino A. DELUCA, Defendant-Appellant.
Superior Court of New Jersey, Appellate Division.
Submitted September 27, 1999.
Decided November 8, 1999.
*457 Ivelisse Torres, Public Defender, for defendant-appellant (Philip V. Lago, Designated Counsel, of counsel and on the brief).
Peter Verniero, Attorney General, for plaintiff-respondent (Michael J. Williams, Deputy Attorney General, of counsel and on the brief.)
Before Judges PETRELLA, BRAITHWAITE and COBURN.
*456 The opinion of the court was delivered by BRAITHWAITE, J.A.D.
On August 21, 1996, defendant and co-defendant, Paul Pallazzo ("Pallazo"), were indicted by the Somerset County grand jury for conspiracy to commit armed robbery, N.J.S.A. 2C:5-2 and N.J.S.A. 2C:15-1; armed robbery, N.J.S.A. 2C:15-1; possession of a firearm for an unlawful purpose, N.J.S.A. 2C:39-4(a); and unlawful possession of a firearm, N.J.S.A. 2C:39-5(b). Thereafter, on June 25, 1997, defendant was indicted in an unrelated matter for second degree robbery and terroristic threats by the Somerset County grand jury.
Defendant's trial on the August 21, 1996 indictment was severed from that of Pallazo. Following a jury trial, defendant was convicted of all counts. At sentencing on the tried convictions, the trial judge merged the conspiracy and both firearm convictions with the armed robbery conviction and sentenced defendant to a custodial term of eighteen years with an eight year period of parole ineligibility. Defendant subsequently entered a guilty plea to the June 25, 1997 indictment pursuant to a plea bargain. The State recommended a sentence of seven years with a one and one-half year period of parole ineligibility, consecutive to the sentence defendant was *458 to receive on the convictions resulting from his trial. The judge followed the recommended sentence in the plea bargain after merging the terroristic threats conviction with the robbery conviction. Defendant's aggregate sentence was twenty-five years with a nine and one-half year parole disqualifier.
Defendant now appeals and contends:
POINT I
The sentence imposed by the court is excessive.
POINT II
The trial court committed plain error by allowing admission of expert testimony on the issue of footprint identification.
POINT III
The trial court erred in denying defendant's motion for a judgment of acquittal on the conspiracy count.
POINT IV
The lower court erred in denying defendant's motion to suppress information retrieved from defendant's pager.
POINT V
Defendant was denied the effective assistance of counsel due to counsel's failure to object to a hearsay statement of the codefendant.
POINT VI
Defendant was denied the effective assistance of counsel due to counsel's failure to prepare for expert evidence in the trial.
A. Failure to Prepare for Maureen Low-Beer's Testimony.
B. Failure to Prepare for Ms. Swec's Testimony.
C. Defendant was Denied the Effective Assistance of Counsel.
POINT VII
The guilty plea to second degree robbery must be vacated and remanded for expansion of the record to determine whether the plea was voluntary and knowing.
We reject these contentions and affirm.

I
On December 20, 1995, at approximately 8:15 p.m., a "yellowish" car was driven onto a property in the Borough of Millstone. The property contains a gasoline station and the Stop and Buy Food Store. The car stopped near the gasoline station and an armed man exited the vehicle and walked into the food store. The gunman was wearing a blue ski mask and holding a black pistol. As he entered the store, he demanded money from the owner, Vipin Patel ("Patel"), who was working behind the counter.
Rather than give the gunman money, Patel ducked behind the counter. The gunman then went behind the counter and struck Patel ten to fifteen times in the head. Although injured and bloodied by the attack, Patel jumped over the counter and escaped out the front door. As Patel fled, the gunman threw the store safe at him, but missed.
The gunman pursued Patel as he ran screaming toward the gasoline station. His screams attracted the attention of the gas station attendant, Tret Wilson, who looked out the station's window and observed the "yellowish" car speeding off and Patel running toward the station covered in blood. The gunman fired the pistol in the direction of the fleeing Patel, missing him, but lodging the bullet in the gas station's window frame. Wilson telephoned the police and Patel was taken to the hospital for treatment of his injuries. The gunman took between $500 and $700 in cash and caused $2,000 in damages to Patel's store.
Hillsborough Township Police Officer Steven Gonzalez ("Gonzalez") responded to a police dispatch and went to the crime scene. The dispatcher notified Gonzalez that there was an armed robbery with two suspects. He was told: "one suspect was *459 possibly operating an older yellow duster-type vehicle. One suspect may have left the scene on foot." While Gonzalez was looking for suspects and evidence outside the store, he was approached by Sean Taylor, a local volunteer fireman, who told Gonzalez that a man was just seen walking in the middle of Hamilton Road attempting to flag down passing cars. Taylor told Gonzalez that the individual in the road was "screaming and yelling and waving his arms," appearing as if he wanted someone to give him a ride.
As Gonzalez headed in the direction where Taylor reported the man in the street, he noticed footprints with a distinctive pattern in the snow. Gonzalez testified that there was about twelve inches of snow, and that the temperature was "possibly below zero" the night of the incident. He further testified that the footprints appeared "consistent" and described them as a "vibrum type sole, a particular, like a triangular like pattern of the wearer." After following the footprints for a while, Gonzalez briefly saw the silhouette of a person approximately 100 feet ahead of him. As Gonzalez radioed for backup, the person disappeared. A second officer responded to the backup call and both officers soon saw the individual that Gonzalez observed earlier, this time about thirty to forty feet away. Gonzalez then yelled "stop, police." The individual immediately ran up the road and into a wooded "brushy" area. Gonzalez returned to his squad car and drove to the wooded area.
When the officers saw the individual again, about 200 to 300 feet away, Gonzalez activated the overhead lights of his squad car and notified headquarters of the suspect. Accompanied by the second officer, Gonzalez entered the wooded area following the same distinctive footprints that he had observed earlier. Gonzalez saw a man, wearing a blue jacket, lying face down on the ground "in a fetal position with his hands deep in the snow, trying to throw snow over himself." The man, later identified as defendant, was arrested and placed in the squad car.
Defendant was searched and an "older style" pager and several Atlantic City casino receipts were recovered. Defendant was then transported to police headquarters where he "started to complain of frostbite." The rescue squad was called. The squad arrived, and transported defendant to the hospital in New Brunswick for treatment. Gonzalez rode to the hospital in the ambulance with defendant. Gonzalez carried the items seized from defendant with him in an evidence bag. The pager "beeped" en route to the hospital.
At the hospital, Gonzalez gave Detective Robert Roseman ("Roseman") the evidence bag containing the pager. While at the hospital, Roseman "read through the numbers" on the pager, writing down the times of each call received and noting that two of the phone numbers were followed by the numbers "911," indicating an emergency. Roseman did this because he had experience with pagers and knew that it was possible to lose information stored in a pager. The first "911" call registered at 9:06 p.m. and was later identified as the telephone number of Pallazo's father. The second call registered at 9:18 p.m. and was later identified as the telephone number of Joseph Lo Mastro ("Lo Mastro"), Pallazo's cousin.
During the trial, Pallazo's father, Thomas Palazzo, testified that his son came to his residence "around nine o'clock" on the evening of the robbery, and was there "between five and ten minutes," and then left. Lo Mastro testified that on the evening of the robbery, Palazzo arrived unexpectedly at his residence and that Palazzo said he was "nervous." While at Lo Mastro's residence, Pallazo used Lo Mastro's telephone to make a call, but Lo Mastro did not hear Pallazo actually speak to anyone. It was also noted that Palazzo lived "two to three" blocks away from Lo Mastro's residence.
The morning after the crime, the State Police conducted a search of the area near *460 the store and recovered from a mailbox on Hamilton Road: a blue ski mask, two latex gloves and a revolver. The revolver had two spent .38 caliber rounds and four live rounds in the chamber. Subsequent ballistics tests confirmed that the bullet recovered from the gas station window frame had been fired from this gun. Also, two hairs discovered on the ski mask were found to be consistent with hair removed from defendant. In addition, DNA markers extracted from saliva stains on the blue ski mask were consistent with markers found in defendant's blood.
Defendant testified at trial and denied any involvement in the crime. He admitted to hitchhiking on Hamilton Road near the crime scene, but claimed to have been running, first, from the husband of his girlfriend, and then, from police, because of outstanding warrants. When confronted with the blue ski mask, defendant admitted that it was "possible" that the ski mask was his, but testified that earlier that day he was wearing the blue ski mask while shoveling snow and when he finished, he took off the mask and placed it in his car. On the basis of this testimony and evidence, the jury convicted defendant of armed robbery, conspiracy to commit armed robbery, possession of a handgun for an unlawful purpose, and unlawful possession of a handgun.
Two weeks later, defendant pled guilty to the unrelated robbery and terroristic threats that were charged in the June 25, 1997 indictment. Pallazo admitted that on February 21, 1997, he used force upon Felice Cicchino, a sixty-seven year old man, and threatened to attack Cicchino if he did not give him money to telephone a taxi cab.

II
In deciding this appeal, we conclude that Point IV of defendant's brief, which addresses the denial of his motion to suppress information retrieved from his pager, warrants the most discussion. Defendant moved to suppress all the evidence seized by the police. The motion judge, following an evidentiary hearing, denied defendant's motion. Defendant "concedes that most of [the judge's] ruling was correct," but asserts that the judge erred in concluding that the information retrieved from his pager was a search incident to his arrest and, therefore, admissible at trial.
We begin by reiterating briefly the facts necessary to resolve this issue. The contested evidence consisted of two telephone numbers, both followed by the number "911," retrieved from defendant's pager. The two telephone calls were received by defendant's pager shortly after the robbery. The first telephone call came at 9:06 p.m. from the residence of the Pallazo's father. The second call came at 9:18 p.m. from the residence of Pallazo's cousin.
The pager was seized from defendant at the time of his arrest. Defendant concedes that the pager itself was properly seized as incident to a lawful arrest. Following defendant's arrest, he was transported to police headquarters. The time frame between defendant's arrest and his arrival at the police station is unknown.
Upon arrival at the Hillsborough Township Police Station, defendant complained of frostbite. The police called the rescue squad for an ambulance to transport defendant to the hospital. The rescue squad arrived at police headquarters, picked up defendant and transported him and Gonzalez to St. Peter's Hospital in New Brunswick. During the trip, defendant's pager, which was in Gonzalez's possession, beeped, indicating that a call had been received. Again, the time that elapsed between these activities is not clear from the record.
It is at the hospital, after Gonzalez turned the pager over to Roseman, that Roseman noticed "that there was a page received" and decided "to scroll through the pager" and retrieve the two telephone numbers. Roseman did this because his experience and knowledge of pagers told *461 him that the numbers might otherwise be irretrievably lost. The record does not indicate how much time elapsed from the time of defendant's arrest to the time that Roseman obtained the information from defendant's pager.
In denying defendant's motion in this regard, the motion judge said in part:
Here the Court finds that the defendant was properly searched incident to a lawful arrest. The search of a person occurred at the time of his arrest, search with regard to armed robbery. As a result of the search, the paging device was seized. Although the telephone numbers were retrieved from the pager sometime later after the defendant was transported to the hospital at his request, it certainly is reasonably contemporaneous with the arrest.
The motion judge relied on three federal cases, United States v. Ortiz, 84 F.3d 977 (7th Cir.1996), United States v. Lynch, 908 F.Supp. 284 (D.Vi.1995), and United States v. Chan, 830 F.Supp. 531 (N.D.Cal.1993), to support his conclusion.
In Ortiz, supra, defendant was arrested in a parking lot during an undercover police operation involving the sale of heroin. 84 F.3d at 982. Upon his arrest, the police seized Ortiz's pager. Ibid. "While still at the parking lot, one of the agents pushed a button on Ortiz's digital pager, which revealed the numeric messages previously transmitted to the pager." Id. at 983. The court went on to note that "it is imperative that law enforcement officers have the authority to immediately `search' or retrieve, incident to a valid arrest, information from a pager in order to prevent its destruction as evidence." Id. at 984.
In Lynch, supra, defendant was arrested "while leaving a hotel room ... where a suitcase containing cocaine had been dropped off earlier by [a] co-defendant...." 908 F.Supp. at 286. The police seized defendant's pager. Ibid. "Soon thereafter the agents obtained the numbers contained in the paging device by pressing a button on the pager." Ibid. The court analogized the pager to a wallet or address book, and relying on federal cases that authorize searches of such items as incident to a lawful arrest, sustained the search. Id. at 287. The government also sought to sustain the search based on exigent circumstances, but the court declined to reach this alternative ground in light of its finding that the search was valid incident to defendant's arrest. Id. at 290.
In Chan, supra, the final case relied on by the motion judge, after defendant's arrest and the seizure of his pager, the police searched the pager within a matter of minutes. 830 F.Supp. at 533. The court distinguished Chan from those cases where the search of a container or other object is "remote in time and space." Id. at 536. The court noted that because the delay of the search of the pager was only a matter of minutes, the search was incident to a valid arrest. Ibid. The court, therefore, did not address the government's alternative argument concerning exigent circumstances. Ibid.
What is clear from the above cases is that the search of the pager in each instance was contemporaneous with the arrest of the respective defendants. "A search incident to an arrest must be contemporaneous with that arrest." State v. Bradley, 291 N.J.Super. 501, 510, 677 A.2d 1129 (App.Div.1996) (citations omitted). "It is sufficient if the valid arrest and search are reasonably contemporaneous, that is, they occur as parts of a single transaction, as connected units of an integrated incident." State v. Doyle, 42 N.J. 334, 343, 200 A.2d 606 (1964).
In the present case, the motion judge found that the search of defendant's pager was "reasonably contemporaneous with the arrest." This finding is not supported by the record. First, defendant was arrested and transported to police headquarters. Then, an ambulance was called and he was transported to a hospital in another municipality in another county. Only then was defendant's pager *462 searched and the telephone numbers retrieved. The record is not clear how much time elapsed during these various events, but generally, a "search is not incidental to an arrest if it takes place at a different time and place than the arrest." State v. Bradley, supra, 291 N.J.Super. at 510, 677 A.2d 1129 (citing State v. Ercolano, 79 N.J. 25, 36 n. 2, 397 A.2d 1062 (1979)). We, therefore, decline, on this record, to affirm the search of defendant's pager on the ground that it was incident to his arrest.
We are satisfied, however, that the search of defendant's pager is valid on the ground of exigent circumstances. "[A]n order or judgment will be affirmed on appeal if it is correct, even though the judge gave the wrong reasons for it." Ellison v. Evergreen Cemetery, 266 N.J.Super. 74, 78, 628 A.2d 793 (App.Div.1993) (citing Isko v. Planning Bd., 51 N.J. 162, 175, 238 A.2d 457 (1968)).
We begin our discussion of exigent circumstances by noting that we have found no reported New Jersey case that addresses the search of a pager. Two federal cases, both relied on by the motion judge, addressed the issue and concluded that a person whose pager is seized from his person during an arrest has an "expectation of privacy in the contents of the pager's memory." Chan, supra, 830 F.Supp. at 535.
The testimony at the hearing indicated that something had to be done to the pager in order to retrieve numbers stored in it. The stored telephone numbers were not in plain sight of an agent just looking at the pager.[ ] Moreover, the pager was being carried on [defendant's] person. It was thus reasonable for the defendant to consider the telephone numbers stored in the pager to be personal and private, and to expect them generally to be free from governmental invasion. [Defendant] therefore had a reasonable expectation of privacy in the contents of the pager's memory.
[Lynch, supra, 908 F.Supp. at 287 (footnote omitted).]
See also People v. Bullock, 226 Cal.App.3d 380, 277 Cal.Rptr. 63, 66-67 (1990). ("[D]efendant established a reasonable expectation of privacy in the information housed in his pager.")
The above cases found a reasonable expectation of privacy under the Fourth Amendment applying the two-pronged test enunciated in Katz v. United States, 389 U.S. 347, 361, 88 S.Ct. 507, 516, 19 L.Ed.2d 576, 588 (1967). Under that test, first "a person [must] have exhibited an actual (subjective) expectation of privacy and, second, that the expectation be one that society is prepared to recognize as `reasonable.'" Ibid.; see also California v. Greenwood, 486 U.S. 35, 108 S.Ct. 1625, 100 L.Ed.2d 30 (1988).
In construing our counterpart to the Fourth Amendment, article 1, paragraph 7 of the New Jersey Constitution, our Supreme Court applied a "slightly different test." State v. Hempele 120 N.J. 182, 198, 576 A.2d 793 (1990). "[T]he New Jersey Constitution requires only that an expectation of privacy be reasonable." Id. at 200, 576 A.2d 793. In making this determination, "we start from the premise that `[e]xpectations of privacy are established by general social norms.'" Ibid. (citation omitted).
Applying this standard, we are satisfied that under the New Jersey Constitution, defendant had a reasonable expectation of privacy in the memory of his pager. A person expects to keep private from government intrusion, the information stored in his personal pager, including the telephone numbers of others who are looking to communicate with him. "Clues to people's most private traits and affairs" may be revealed in the identity of persons calling a pager, whose names could be obtained from their telephone numbers. Id. at 201, 576 A.2d 793; cf. State v. Hunt, 91 N.J. 338, 347, 450 A.2d 952 (1982).
The evidence presented at the suppression hearing supported the application of *463 the exigent circumstances exception to the warrant requirement. The dispatch to Gonzalez advised that one suspect was operating a car and the other left the scene on foot. The police had already apprehended defendant and were still looking for Pallazo, who sped off once the victim ran out of his store toward the gasoline station.
When Roseman received the pager from Gonzalez, Roseman knew that a "page came in" from looking at the pager. Morever, Roseman had experience with pagers and owned one similar to defendant's. Roseman was also aware that pagers have varying memory capabilities and that it is possible to erase or lose information stored in a pager when additional calls are received. As Roseman testified: "If I have all ten numbers saved, it [the pager] will say memory full, and it will not put a new number into it. If I have ten numbers and they are not saved let's say or a certain [one is not] saved, when I get that 11th call, it will immediately erase the number one call on the list or the one I received earliest." With this knowledge and experience, Roseman retrieved two numbers from the pager.
In determining whether the circumstances in a particular case are in fact exigent, courts consider multiple factors. They are:
(1) the degree of urgency involved and the amount of time necessary to obtain a warrant; (2) reasonable belief that the contraband is about to be removed; (3) the possibility of danger to police officers guarding the site of contraband while a search warrant is sought; (4) information indicating the possessors of the contraband are aware that the police are on their trail; (5) the ready destructibility of the contraband and the knowledge that efforts to dispose of narcotics and to escape are characteristic behavior of persons engaged in narcotics traffic; (6) the gravity of the offense involved; (7) the possibility that the suspect is armed; (8) the strength or weakness of the facts establishing probable cause[;] and (9) the time of the entry.
[State v. Alvarez, 238 N.J.Super. 560, 568, 570 A.2d 459 (App.Div.1990) (citations omitted).]
See also State v. Hutchins 116 N.J. 457, 465-66, 561 A.2d 1142 (1989); State v. Lewis, 116 N.J. 477, 484, 561 A.2d 1153 (1989). Here, the offense involved was serious, an armed robbery that involved the brutal beating of the victim and a gun shot that, fortunately, did not kill or injure anyone. Roseman had a reasonable belief that evidence necessary to the investigation might be lost if he did not act quickly. Because Pallazo fled the scene, it was reasonable for Roseman to believe that the search of the pager might yield information about him. Moreover, the pager revealed to Roseman that a call had been received. "[T]he focus of the exigent circumstance inquiry is upon the objective reasonableness of the officer's belief that immediate action was necessary...." U.S. v. Romero-Garcia, 991 F.Supp. 1223, 1225 (D.Or.1997). We are satisfied that this standard was satisfied here.
Finally, on this issue, we take note of what the United States Supreme Court said about the exigent circumstances exception to the warrant requirement: "There are exceptional circumstances in which, on balancing the need for effective law enforcement against the right of privacy, it may be contended that a magistrate's warrant for search may be dispensed with." Johnson v. United States, 333 U.S. 10, 14-15, 68 S.Ct. 367, 369, 92 L.Ed. 436, 440-41 (1948). This case is one of those circumstances.

III
We will now address briefly the remaining points raised by defendant. Defendant's aggregate sentence was twenty-five years with a nine and one-half year period of parole ineligibility. He asserts that the sentence is excessive. We disagree. The trial judge properly refused to *464 consider defendant's intoxication as a mitigating factor. "Crimes committed under the influence of alcohol or drugs do not detract from the seriousness of the offense." State v. Towey, 244 N.J.Super. 582, 595, 583 A.2d 352 (App.Div.) certif. denied, 122 N.J. 159, 584 A.2d 226 (1990) (citing State v. Roth, 95 N.J. 334, 368, 471 A.2d 370 (1984)); see also State v. Rivera, 124 N.J. 122, 126, 590 A.2d 238 (1991). Further, the sentence is not manifestly excessive or unduly punitive and does not constitute an abuse of discretion. See State v. O'Donnell, 117 N.J. 210, 215, 564 A.2d 1202 (1989); State v. Ghertler, 114 N.J. 383, 387-88, 555 A.2d 553 (1989); Roth, supra, 95 N.J. at 365-66, 471 A.2d 370. Thus, we affirm defendant's sentence.
The State cross-appealed as to defendant's sentence, arguing that the trial judge erred in merging defendant's unlawful possession of a handgun conviction with his conviction for armed robbery. We agree. Because the gravamen of unlawful possession of a handgun is possessing it without a permit, it does not merge with a conviction for a substantive offense committed with the weapon. See State v. Bowser, 297 N.J.Super. 588, 592 n. 1, 688 A.2d 1060 (App.Div.1997); State v. Cooper, 211 N.J.Super. 1, 22-23, 510 A.2d 681 (App. Div.1986). We, therefore, vacate the merger of this conviction and remand for sentencing.
The trial judge did not err in allowing Gonzalez to testify about foot prints found in the snow. A non-expert may give an opinion on matters of common knowledge and observation. State v. LaBrutto, 114 N.J. 187, 197, 553 A.2d 335 (1989). The testimony of a police officer regarding his observations of footprints in the snow and his conclusion that the footprints were similar to the prints left by defendant's boots is not a matter of expert opinion. See State v. Johnson, 120 N.J. 263, 294-95, 576 A.2d 834 (1990); State v. Harvey, 121 N.J. 407, 427, 581 A.2d 483 (1990), cert. denied, 499 U.S. 931, 111 S.Ct. 1336, 113 L.Ed.2d 268 (1991); see also Johnson v. State, 59 N.J.L. 535, 543, 37 A 949 (E. & A. 1896) (finding that a witness' testimony about a footprint's appearance "involved in no sense the knowledge of an expert....").
Further, the trial judge properly denied defendant's motion for a judgment of acquittal on the conspiracy count. In considering a motion for a judgment of acquittal at the close of the State's case or after all the evidence has been presented, the test is:
whether, viewing the State's evidence in its entirety, be that evidence direct or circumstantial, and giving the State the benefit of all its favorable testimony as well as all of the favorable inferences which reasonably could be drawn therefrom, a reasonable jury could find guilt of the charge beyond a reasonable doubt.

[State v. Reyes, 50 N.J. 454, 459, 236 A.2d 385 (1967); R. 3:18-1.]
The only issue is whether the State's proofs, be they direct or circumstantial, are sufficient to permit the jury to find defendant's guilt beyond a reasonable doubt. State v. Taccetta, 301 N.J.Super. 227, 240, 693 A.2d 1229 (App.Div.), certif. denied, 152 N.J. 187, 704 A.2d 17 (1997). Moreover, in considering such a motion the trial judge views the evidence most favorably to the State. State v. Milton, 255 N.J.Super. 514, 521, 605 A.2d 757 (App. Div. 1992). The proofs were sufficient for a reasonable jury to find defendant guilty of the conspiracy count. The trial judge properly denied defendant's motion at the conclusion of the State's case and upon the conclusion of his defense.
Next, defendant argues that his counsel was ineffective because he did not object to a hearsay statement from Pallazo. For a hearsay error to mandate reversal, "[t]he possibility [of an unjust verdict] must be real, one sufficient to raise a reasonable doubt as to whether the error led the jury to a result it otherwise *465 might not have reached." State v. Bankston, 63 N.J. 263, 273, 307 A.2d 65 (1973) (citation omitted). No such conclusion can be drawn here. We likewise reject defendant's ineffective assistance claim as it pertains to his counsel's preparation for the expert evidence presented at trial. This contention does not warrant further discussion in a written opinion. R. 2:11-3(e)(2).
Finally, defendant argues that his guilty plea to second degree robbery was not "voluntary and knowing." Defendant claims for the first time on appeal that he was intoxicated during the commission of the crime and that the trial judge did not question him about his intoxication during the commission of the crime. We reject these contentions. Defendant knowingly and voluntarily pled guilty to robbery and terroristic threats against a sixty-seven year old man. He concedes that he never sought to withdraw his guilty plea. Our review of this record convinces us that there is no basis to allow defendant to withdraw his guilty plea.
We affirm defendant's convictions but remand for sentencing on the conviction for unlawful possession of a handgun.