STATE OF NEW JERSEY, PLAINTIFF-APPELLANT, v. JOHN LEWIS, DEFENDANT-RESPONDENT.

Argued April 25, 1989—Decided August 11, 1989.

*Catherine A. Foddai,* Deputy Attorney General, argued the cause for appellant (*Peter N. Perretti, Jr.,* Attorney General of

New Jersey, attorney, *Catherine A. Foddai* and *Richard H. Morton*, Deputy Attorney General, on the brief).

*Barbara J. Lieberman*, Designated Counsel, argued the cause for respondent (*Alfred A. Slocum*, Public Defender, attorney).

*Harvey Weissbard* and *Alan L. Zegas* submitted a brief on behalf of *amicus curiae*, Association of Criminal Defense Lawyers of New Jersey (*Weissbard & Wiewiorka* and *Alan L. Zegas* attorneys).

The opinion of the Court was delivered by

STEIN, J.

In this case, as in *State v. Hutchins*, also decided today, 116 *N.J.* 457 (1989), we consider the legality of a warrantless entry into a home pursuant to an informant's tip of suspected drug activity. The trial court denied defendant's motion to suppress a portion of the evidence obtained by the police following entry into the house, relying on the "plain view" exception to the warrant requirement, but granted defendant's motion to suppress other evidence subsequently discovered by the police. The Appellate Division reversed, holding that all evidence obtained in the course of the arrest and search should have been suppressed because the State failed to justify the warrantless entry into the home. We granted certification, 114 *N.J.* 475 (1989), and now affirm.

I.

On February 1, 1984, at approximately 10:45 a.m., Patrolman Patrick Da'Elia of the Newark Police Department received a telephone call from an informant. Officer Da'Elia, an eighteen-year veteran of the Newark Police Department who had participated in "hundreds" of narcotics arrests, testified at the suppression hearing that his prior dealings with this informant had proven him to be "very" reliable. The informant told Da'Elia that he had information about a person dealing in narcotics and

wanted to meet with police officers. Da'Elia and another officer met with the informant at approximately 11:00 a.m. The informant told Da'Elia that he had recently left John Lewis' apartment at 595 North Sixth Street. He said that he had observed narcotics on the kitchen table and other paraphernalia in the apartment, that several other people were present in the apartment, that one had a gun, and that they were packaging drugs and getting ready to distribute them. The informant told the officers that they should go to defendant's apartment as soon as possible, because the occupants were preparing to leave.

Da'Elia notified his sergeant of the information he had received. The sergeant told him to go to Lewis' apartment immediately and attempt to gain entry. At approximately 11:30 a.m., Da'Elia met with seven other patrol officers in the area of Seventh Street and Clinton Avenue, and then proceeded to defendant's apartment, arriving sometime between 12:00 noon and 12:30 p.m. Some of the officers entered the apartment building while others, including Da'Elia, remained outside near the rear of the building.

Patrolman Anthony Pilino knocked on the door of the apartment. A male voice answered, "who is it?" In response, Pilino mumbled "it's Tony." Defendant opened the door, observed Pilino in uniform, and attempted to close the door. Pilino stuck his foot in the door to keep it open. With the door partially open Pilino observed, on the kitchen table, a glass, a gold razor blade, and a clear bottle containing a white powder believed by the officer to be narcotics. Although the State asserts that it is "unclear from the testimony whether Officer Pilino made these observations before or after defendant attempted to close the door," defendant contends that the officer made these observations only *after* defendant attempted to close the door. Officer Pilino's testimony concerning his observation of the items on the kitchen table was as follows:

[A]t that point, the door opened * * * and there was a male there, and at that point he saw that—well, I had a uniform on and the male behind the door tried

to close the door and I had my foot in the door, I kept it open, and at that point I observed on the kitchen table a glass, a clear bottle which contained a white powder.

Pilino then entered the apartment. Defendant, the only occupant, was arrested. The officers searched the apartment, consisting of a 9' × 12' kitchen and a slightly smaller bedroom. In addition to the items seized from the kitchen table, pieces of tin foil, a plastic bag containing marijuana cigarettes, and a book with narcotics residue on it were found by the officers. Other assorted narcotics and narcotics paraphernalia were located and seized from the kitchen and defendant's bedroom: a bottle of methadone in the refrigerator; hypodermic needles and syringes on top of the refrigerator; a paper bag in a cardboard box in the kitchen with glassine envelopes; silver spoon with residue; glassine envelope with white powder; and one tin with cocaine. The officers also discovered and seized a loaded .25 caliber handgun from underneath the pillow of defendant's bed, as well as eight rounds of .22 caliber ammunition in a drawer under the bed.

Defendant was charged with possession of cocaine, *N.J.S.A.* 24:21-20 (Count I); possession of cocaine with intent to distribute, *N.J.S.A.* 24:21-19a(1) (Count II); possession of valium and methadone, *N.J.S.A.* 24:21-20 (Count III); and possession of a firearm without a purchaser's permit, *N.J.S.A.* 2C:39-10 (Count IV). A Newark municipal complaint was also filed against defendant, charging him with possession of less than twenty-five grams of marijuana, *N.J.S.A.* 24:21-20a(4) (Count I); unlawful possession of a hypodermic needle and syringe, *N.J.S.A.* 24:21-51c (Count II); and possession of narcotics paraphernalia, *N.J.S.A.* 24:21-47 (Count III).

On defendant's motion to suppress the evidence found in the apartment, the trial court found that the "totality of the circumstances" justified the officers' actions in attempting to enter defendant's apartment without a warrant, and that the "plain

view" exception to the warrant requirement authorized the seizure of the articles found on the kitchen table.[1]

However, the court held that once defendant was in custody, the officers impermissibly engaged in a warrantless search outside of defendant's "immediate area." Accordingly, the court granted defendant's motion to suppress all other evidence, including the handgun, because there was "no sound reason" for the extensive warrantless search.[2]

Following the disposition of the suppression motion, the defendant pled guilty to possession of cocaine and to the municipal charges. He was sentenced to concurrent two-year terms of probation and fined $100.

The Appellate Division reversed the trial court's denial of defendant's motion to suppress the evidence found in "plain view" on the kitchen table. The court concluded that "the State has not satisfied its 'heavy burden' of proof sufficient to justify entry into the dwelling area without prior judicial approval." *State v. Lewis*, 227 *N.J.Super.* 593, 594 (1988). The court rendered its ruling on state constitutional grounds exclusively. *Id.* at 594–95 & n. 1.

The court held that the trial court improperly relied on the "plain view" exception to the warrant requirement to justify the seizure of the articles observed on the kitchen table and refrigerator. *Id.* at 597. The Appellate Division reasoned that "[t]here is no doubt from Officer Pilino's testimony that he

---

[1] The trial court emphasized the overall reasonableness of the officers' response, and maintained that the time it took for the officers to get to the apartment did not indicate an unreasonable delay. While the officers' testimony established that they arrived at the apartment sometime between 12:00 noon and 12:30 p.m., defense counsel noted at the suppression hearing that the police report stated that the time of the arrest was 2:25 p.m. The trial court, however, accepted the State's version of the facts, finding that the arrest and search occurred shortly after the officers' arrival.

[2] The State did not seek review of the suppression of the "other" evidence— that is, the gun and other drug paraphernalia found in the house.

made an entry by holding the door open before he saw the contraband on the kitchen table." *Ibid.* Because the Appellate Division could find no exigency to justify the entry, it held the "plain view" exception clearly inapplicable since "[i]t does not apply unless [the officers] were 'lawfully in the viewing area' in the first place." *Ibid.* (quoting *State v. Bruzzese*, 94 *N.J.* 210, 237 (1983)). The Appellate Division concluded that there was no justification for the officers' failure to obtain a search warrant:

> [T]he State has not met its "heavy burden" of demonstrating that the warrantless entry and search of this dwelling area was justified. The entry, search and seizure occurred at midday on a Wednesday. The informant spoke to the police only a mile from the County and Municipal courthouse in this State's biggest city. Eight policemen were dispatched to raid defendant's apartment, two miles from the courthouse. (The location where the informant talked to Officer Da'Elia was equidistant between the courthouse and the location of the raid on defendant's apartment on North Sixth Street.)
>
> The search is presumed invalid. Our "after-the-fact" evaluation does not satisfy us that the State has justified an intrusion into a living area without a warrant. The showing of the alleged informant's reliability and veracity used to establish the claimed probable cause was "bare-bones" at best. No effort was made to obtain a warrant. Not the slightest excuse for failure to try was proferred or seems palatable under the circumstances. [*Id.* 227 *N.J. Super.* at 601 (citations omitted).]

## II.

This case, like *State v. Hutchins, supra,* 116 *N.J.* 457, involves application of the exigent-circumstance exception to the warrantless entry of defendant's apartment. We emphasized in *Hutchins* the heavy burden that must be overcome to justify a warrantless entry into a home:

> As the United States Supreme Court has acknowledged, "physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed." *United States v. United States Dist. Court*, 407 *U.S.* 297, 313 [92 *S.Ct.* 2125, 2134] 32 *L.Ed.*2d 752, 764 (1972). Accordingly, it is well established that "searches and seizures inside a home without a warrant are presumptively unreasonable," *Payton v. New York*, 445 *U.S.* 573, 586 [100 *S.Ct.* 1371, 1380] 63 *L.Ed.*2d 639, 651 (1980), and hence "prohibited by the Fourth Amendment, absent probable cause and exigent circumstances." *Welsh v. Wisconsin*, 466 *U.S.* 740, 749 [104 *S.Ct.* 2091, 2097] 80 *L.Ed.*2d 732, 743 (1984). [*State v. Hutchins, supra,* 116 *N.J.* at 463.]

We also reviewed in *Hutchins* the limited number of situations that have been categorized as exigent circumstances sufficient to overcome the warrant requirement. Among them are the hot pursuit of a fleeing armed felon, *see Warden v. Hayden*, 387 *U.S.* 294, 87 *S.Ct.* 1642, 18 *L.Ed.*2d 782 (1967), the avoidance of serious injury to police officers or others, *id.* at 298–99, 87 *S.Ct.* at 1645–46, 18 *L.Ed.*2d at 787, and the potential destruction of evidence, *see United States v. Santana*, 427 *U.S.* 38, 96 *S.Ct.* 2406, 49 *L.Ed.*2d 300 (1976). The United States Supreme Court has emphasized the narrow scope of the exigent-circumstance exception:

> [O]ur past decisions make clear that only in "a few specifically established and well-delineated" situations, may a warrantless search of a dwelling withstand constitutional scrutiny, even though the authorities have probable cause to conduct it. The burden rests on the State to show the existence of such an exceptional situation. And the record before us discloses none.
>
> There is no suggestion that anyone consented to the search. The officers were not responding to an emergency. They were not in hot pursuit of a fleeing felon. The goods ultimately seized were not in the process of destruction. Nor were they about to be removed from the jurisdiction. [*Vale v. Louisiana*, 399 *U.S.* 30, 34–35 [90 *S.Ct.* 1969, 1971–72] 26 *L.Ed.*2d 409, 413–14 (1970) (citations omitted).]

We also noted in *Hutchins* that numerous federal courts have applied the exigent-circumstances exception in the context of warrantless home entries in drug cases. *See State v. Hutchins, supra,* 116 *N.J.* at 467 n. 1. Suggested criteria for testing the validity of warrantless home entries in drug cases, on the basis of exigent circumstances, were advanced by the Third Circuit in *United States v. Rubin*, 474 *F.*2d 262 (1973):

> (1) the degree of urgency involved and the amount of time necessary to obtain a warrant; (2) reasonable belief that the contraband is about to be removed; (3) the possibility of danger to police officers guarding the site of the contraband while a search warrant is sought; (4) information indicating the possessors of the contraband are aware that the police are on their trail, and (5) the ready destructibility of the contraband and the knowledge "that efforts to dispose of narcotics and to escape are characteristic behavior of persons engaged in the narcotics traffic." [*Id.* at 268–69 (citations omitted).]

Although threatened destruction of evidence is perhaps the most frequently relied on exigent circumstance in drug cases, *see, e.g., United States v. Santana, supra,* 427 *U.S.* 38, 43, 96

*S.Ct.* 2406, 2409–10, 43 *L.Ed.*2d 300, 305; *United States v. Socey,* 846 *F.*2d 1439 (D.C.Cir.), *cert.* denied, ——— U.S. ———, 109 *S.Ct.* 152, 102 *L.Ed.*2d 123 (1988); *United States v. Aquino,* 836 *F.*2d 1268 (10th Cir.1988), the threatened *removal* of drugs from a residence can also constitute an exigent circumstance according to other courts. *See, e.g., United States v. Curran,* 498 *F.*2d 30, 35 (9th Cir.1974); *United States v. Rubin, supra,* 474 *F.*2d at 268–69. Where removal rather than destruction of drugs is offered as an exigent circumstance, a collateral issue is whether the physical character of the premises is conducive to effective surveillance, as an alternate to a warrantless entry, while a warrant is procured. *Cf. United States v. Curran, supra,* 498 *F.*2d at 35 (concluding that a long seige of the premises entered would have been inconvenient, burdensome, and easily discovered).

## III.

 Some preliminary observations are appropriate. First, the Appellate Division correctly concluded that the trial court improperly relied on the "plain view" doctrine to sustain the warrantless entry and seizure of the items on the kitchen table. 227 *N.J.Super.* at 597. Proper application of the "plain view" doctrine requires not only the preexistence of probable cause, *see Arizona v. Hicks,* 480 *U.S.* 321, 107 *S.Ct.* 1149, 94 *L.Ed.*2d 347 (1987), but also that the "officer's access to an object [have] some prior justification under the Fourth Amendment." *Texas v. Brown,* 460 *U.S.* 730, 738, 103 *S.Ct.* 1535, 1541, 75 *L.Ed.*2d 502, 511 (1973). *See also State v. Bruzzese,* 94 *N.J.* 210, 236 (1983) ("[T]he police officer must be lawfully in the viewing area."), *cert.* denied, 465 *U.S.* 1030, 104 *S.Ct.* 1295, 79 *L.Ed.*2d 695 (1984). In this case, despite the State's protestations, Officer Pilino's testimony clearly established that the "plain view" of the items on the kitchen table occurred after he used his foot to stop defendant from closing the door. Thus, the officer's observation of the evidence does not advance the State's position unless the police were authorized forcibly to

prevent defendant from closing the door, and their subsequent seizure of the items observed depends on the officers' right to make a warrantless entry. *See Coolidge v. New Hampshire,* 403 *U.S.* 443, 465–68, 91 *S.Ct.* 2022, 2045–46, 29 *L.Ed.*2d 564, 582–84 (1971) ("[P]lain view *alone* is never enough to justify the warrantless seizure of evidence," *id.* at 468, 91 *S.Ct.* at 2046, 29 *L.Ed.*2d at 584).

■ Secondly, we agree with the Appellate Division's observation that the "claimed probable cause was 'bare bones' at best." 227 *N.J.Super.* at 601. The substance of the informant's tip in this case was based on his presence in defendant's apartment, and his credibility was based on his prior dealings with Officer Da'Elia. Thus, the "tip" appears to satisfy both prongs of the test established in *Aguilar v. Texas,* 378 *U.S.* 108, 84 *S.Ct.* 1509, 12 *L.Ed.*2d 723 (1964), which continues to illuminate application of the recently-adopted totality-of-the-circumstances test for probable cause. *See Illinois v. Gates,* 462 *U.S.* 213, 230–31, 103 *S.Ct.* 2317, 2328–29, 76 *L.Ed.*2d 527, 543–44 (1985). We follow the totality-of-the circumstances test for probable cause, *see State v. Novembrino,* 105 *N.J.* 95, 122 (1987), and hence our assessment of facts advanced to support probable cause extends beyond consideration of an informant's credibility and basis of knowledge. *Id.* at 123 In this case, the informant was described as "very" reliable without any further evidence of his credibility. His reference to "narcotics on the kitchen table" omitted any indication of type, quantity, or value, and he was unable to identify any occupants of the apartment. No aspect of the tip had been verified by the officers before their warrantless entry.

In setting forth criteria for applying the exigent-circumstances doctrine, the District of Columbia Court of Appeals included as a standard "that there exists not merely the minimum of probable cause, that is requisite even when a warrant has been issued, but beyond that a clear showing of probable cause * * *." *Dorman v. United States,* 435 *F.*2d 385 (1970) (*en*

*banc*). The content of the informant's tip in this case fell short of "a clear showing of probable cause." As the Appellate Division observed: "A neutral, detached magistrate could probably have developed some corroborating details for this alleged reliability [of the informant] by a 'more thorough and deliberate examination of the factual basis for issuing the warrant.' " 227 *N.J.* at 599 (quoting *State v. Valencia,* 93 *N.J.* 126, 135 (1983)).

Nevertheless, the decisive issue is whether the informant's statement to the police that the apartment's occupants were "getting ready to leave," thus threatening removal of any narcotics on the premises, was a sufficient exigent circumstance to justify the officers' warrantless entry into the apartment. The issue is highly fact-sensitive. The factors set forth in *United States v. Rubin, supra,* 474 *F.*2d at 268–69, are helpful but not exhaustive. In addition to a reasonable belief that drugs were about to be removed, the *Rubin* court emphasized "the degree of urgency involved," *id.* at 268, presumably encompassing the magnitude of the drug operation and the imminence of the removal, as well as the time necessary to obtain a warrant. *Ibid.* Here, there was no evidence concerning the "magnitude" of the drug operation, although the quantity of drugs discovered at the apartment and the sentence imposed on defendant are not reflective of a large-scale narcotics operation. Moreover, the Appellate Division noted that a warrant would have been quickly and readily available:

> We are troubled here because no effort was made to secure either a written or telephonic warrant. *See State v. Valencia,* 93 *N.J.* 126 (1983); *State v. Apostolis,* 93 *N.J.* 143 (1983). These events took place in the middle of a weekday in central Newark where a number of judges are readily available. [227 *N.J.Super.* at 598–99 (footnote omitted).]

The *Rubin* Court also emphasized "the possibility of danger to police officers guarding the site of the contraband while a search warrant is sought," 474 *F.*2d at 268, echoing the concern expressed in *United States v. Curran, supra,* over whether a prolonged surveillance of premises while a warrant is obtained is a feasible alternative to a warrantless entry. 498 *F.*2d at 35.

In this case the record suggests that there would have been no practical impediment to the officers' securing the premises and maintaining surveillance until a written or telephonic warrant was procured. There were eight officers dispatched, two of whom secured the rear of the building while the other six gathered at the door to defendant's apartment. Although we acknowledge the advantage of hindsight—since the officers did not know that defendant was alone in the apartment—there is no evidence in the record to suggest that the premises could not have been safely secured while one of the officers obtained a search warrant. *Cf. United States v. Pino*, 431 *F.*2d 1043, 1045 (2d Cir.1970) (Search of apartment for heroin by two officers at 1:00 a.m. justified because of difficulty of obtaining warrant at that hour and danger to remaining officer if left to guard apartment while warrant was obtained.), *cert.* denied, 402 *U.S.* 989, 91 *S.Ct.* 1675, 29 *L.Ed.*2d 154 (1971). Assuming that on this evidence a warrant was obtainable, it is reasonable to infer that the warrant could have been sought and issued within the time period between the meeting with the informant and the time of defendant's arrest or shortly thereafter. Surveillance of these premises for a limited time period to prevent removal of the drugs while a warrant was obtained was clearly the appropriate police procedure.

We emphasize the factual context for our conclusion that the exigent circumstances advanced by the State in *this* case did not justify a warrantless entry. Our function is not to second-guess police officers, but rather to establish guidelines within which objectively-reasonable police action can be sustained. Unless law-enforcement officials are faced with exceptional conditions, the prudent course is to obtain a search warrant in order to effectuate the policies underlying the fourth amendment. As Justice Jackson explained in *Johnson v. United States*, 333 *U.S.* 10, 68 *S.Ct.* 367, 92 *L.Ed.* 436 (1947):

The point of the Fourth Amendment, which often is not grasped by zealous officers, is not that it denies law enforcement the support of the usual inferences which reasonable men draw from evidence. Its protection consists in

requiring that those inferences be drawn by a neutral and detached magistrate instead of being judged by the officer engaged in the often competitive enterprise of ferreting out crime. Any assumption that evidence sufficient to support a magistrate's disinterested determination to issue a search warrant will justify the officers in making a search without a warrant would reduce the Amendment to a nullity and leave the people's homes secure only in the discretion of police officers. [*Id.* at 13–14, 91 *S.Ct.* at 1678–79, 92 *L.Ed.* at 440.]

Notwithstanding the strong constitutional preference for warrant-authorized searches, Justice Jackson acknowledged that

[t]here are exceptional circumstances in which, on balancing the need for effective law enforcement against the right of privacy, it may be contended that a magistrate's warrant for search may be dispensed with. [*Id.* at 14–15, 91 *S.Ct.* at 1678, 92 *L.Ed.* at 440–41.]

Thus, the question in each case is whether the circumstances advanced to justify a warrantless entry are sufficiently compelling to overcome the presumptive constitutional requirement that the entry be authorized by a warrant. Police officers should approach the issue pragmatically, and not technically, understanding both the constitution's preference for a warrant and the accommodation permitted by the fourth amendment to dispense with the warrant under exceptional circumstances. Our holding here, circumscribed by the specific evidence found in the limited record developed at the suppression hearing, is that the circumstances offered by the State to justify the warrantless entry by the officers were inadequate to overcome the constitutional preference for a search warrant that established probable cause for the entry and search of defendant's residence.

Although we affirm the judgment of the Appellate Division, we do so on the basis of the federal constitution, and not on the basis of our state constitution, on which the Appellate Division relied. 227 *N.J.Super.* at 594–95 & n. 1. *See State v. Hunt,* 91 *N.J.* 338, 361–63 (1982) (Handler, J., concurring); Pollock, *State Constitutions as Separate Sources of Fundamental Rights,* 35 *Rutgers L. Rev.* 718–19 (1983).

HANDLER, J., concurs in the judgment.

*For affirmance*—Justices CLIFFORD, POLLOCK, O'HERN, GARIBALDI and STEIN—6.