238 N.J. Super. 560 (1990)
570 A.2d 459
STATE OF NEW JERSEY, PLAINTIFF-APPELLANT,
v.
ERIC ALVAREZ AND PAUL BARTLEY, DEFENDANTS-RESPONDENTS.
Superior Court of New Jersey, Appellate Division.
Argued January 24, 1990.
Decided February 15, 1990.
*562 Before Judges BAIME and KEEFE.
Jack J. Lipari, Assistant Prosecutor, argued the cause for appellant (Jeffrey S. Blitz, Atlantic County Prosecutor, attorney; Jack J. Lipari on the letter-brief).
John L. Hehre, Assistant Deputy Public Defender, argued the cause for respondent Alvarez (Thomas S. Smith, Jr., Acting Public Defender, attorney; John L. Hehre on the letter-brief).
Respondent Paul Bartley's brief was suppressed.
The opinion of the court was delivered by BAIME, J.A.D.
We granted the State's motion for leave to appeal from an order of the Superior Court, Law Division, suppressing approximately one ounce of cocaine and related drug paraphernalia seized by the police in a warrantless search of defendant Eric Alvarez's hotel room. The Law Division judge found that the search was not supported by probable cause and that the evidence was not within the plain view of the arresting police officers prior to their entry into the room. The State asserts that the Law Division judge's findings of fact are not supported by sufficient credible evidence present in the record. Alternatively, the State argues that the facts, as found by the Law Division judge, were sufficient to establish probable cause.

I.
The salient facts can be briefly summarized. At approximately twelve noon on November 23, 1988, Detective Samuel *563 Thomas, a member of the Atlantic City police department, was on duty in uniform when he was approached by a woman who reported that there was a disturbance relating to drugs on the fourth floor of the nearby Aristocrat Hotel. Armed with that information, Detective Thomas immediately proceeded to the hotel where he was told by the desk clerk that Room 402 was the only one occupied and that, although she was not aware of a disturbance, there had been numerous telephone calls and "foot traffic" to and from that room. Scanning the desk register, Detective Thomas noticed that Room 402 was registered to defendant Alvarez. Detective Thomas was familiar with Alvarez from a prior narcotics investigation.
His suspicions aroused, Detective Thomas "called for a backup." Three plain clothes detectives who had been working nearby responded. The four officers proceeded to the fourth floor. From their vantage point in the hallway, the detectives heard a male voice from Room 402 state "if we sell one more ounce, we'll have enough to re-up." Based upon their training and experience, the detectives believed that there was an ongoing scheme to distribute drugs from the room and that after making another sale, the perpetrators would attempt to "resupply."
After knocking on the door, one of the officers, in a falsetto voice, identified himself as the maid. According to the detectives, when the door to the room was opened, they observed narcotics and drug paraphernalia in plain view. They then entered the room, seized the contraband and arrested the occupants.
The principal factual issue presented at the hearing was whether the detectives observed the drugs prior to their entry into the hotel room. We need not recount the evidence presented with respect to that question in great detail. Suffice it to say, the testimony of the four detectives deviated on that critical point.
*564 Based upon the foregoing evidence, the Law Division judge found that the detectives had already entered the room when they observed the narcotics and drug paraphernalia. The judge determined the facts known to the officers prior to their entry into the hotel room were not sufficient to establish probable cause. Concluding that the detectives entry into the room was unlawful, the judge ordered the suppression of the evidence seized.

II.
Preliminarily, we reject the State's argument that the Law Division judge erred in finding as a fact that the detectives entered the hotel room prior to observing the contraband. Although the issue was hotly contested, we are entirely satisfied that the findings made by the judge could reasonably have been reached on sufficient credible evidence present in the record. State v. Johnson, 42 N.J. 146, 165, 199 A.2d 809 (1964). In this respect, we are obliged to review the record in light of the State's contention, but not initially from the point of view of how we would decide the matter if we were the court of first instance. Id. at 161, 199 A.2d 809. The aim of our review is to determine whether the judge's findings are supported by evidence in the hearing transcript. Id. at 162, 199 A.2d 809. In making that determination, we are duty-bound to give deference to those findings which are substantially influenced by the judge's opportunity to hear and see the witnesses and to have the "feel" of the case. Id. at 161, 199 A.2d 809. Applying these principles, we cannot fairly say that the Law Division judge went so wide of the mark, a mistake must have been made.

III.
While the scope of our review of the judge's factual findings is narrow and restricted, we are not similarly confined in assessing the validity of the legal conclusions he reached. *565 Accepting the Law Division judge's findings of fact, we are nevertheless convinced that probable cause existed prior to the police entry into defendant's hotel room. Putting aside the detectives' observations of the contraband, we are of the view that the officers harbored a good faith and reasonable belief that the occupants of the room were engaged in criminal conduct.
Probable cause is an elusive concept incapable of precise definition. It is more than mere suspicion but less than legal evidence necessary to convict. State v. Mark, 46 N.J. 262, 271, 216 A.2d 377 (1966). It has been described by our Supreme Court as a "well grounded" suspicion that an offense has been committed. State v. Burnett, 42 N.J. 377, 387, 201 A.2d 39 (1964); see also State v. Waltz, 61 N.J. 83, 87, 293 A.2d 167 (1972); State v. Dilley, 49 N.J. 460, 463-464, 231 A.2d 353 (1967). Our courts have eschewed technisms in reviewing factual circumstances to determine whether probable cause exists. State v. Esteves, 93 N.J. 498, 503, 461 A.2d 1128 (1983). Probable cause must be drawn from "practical considerations of everyday life" as tested by reasonably prudent persons. Brinegar v. United States, 338 U.S. 160, 175, 69 S.Ct. 1302, 1310, 93 L.Ed. 1879, 1890 (1949). In dealing with probable cause, as the very name implies, we are concerned with probabilities. Ibid. Resolution of such issues is rarely susceptible to abstract contemplation. Rather, the answer must be found in the "tumult of the streets." State v. Gerardo, 53 N.J. 261, 264, 250 A.2d 130 (1969). Hence, the decisions of police officers which, as here, often must be made on the spur of the moment, cannot be viewed from the vantage point of twenty-twenty hindsight. State v. Grant, 196 N.J. Super. 470, 476, 483 A.2d 411 (App.Div. 1984).
In this case, we are dealing with law enforcement efforts to eradicate one of the chief instrumentalities of human catastrophe, the distribution of dangerous drugs. The business is carried on warily and guardedly and in as many different ways and by as many conceivable methods as human ingenuity can *566 devise in order to escape detection. Cf. State v. Romeo, 43 N.J. 188, 207, 203 A.2d 23 (1964). That drug abuse constitutes an ancient foe of society does not, of course, detract from the need to insure the protection of Fourth Amendment rights. We point to the magnitude of the problem merely to emphasize that "[l]aw enforcement officers have an even higher and more detailed degree of knowledge than judges of the devious ways" of the drug distributor. State v. Contursi, 44 N.J. 422, 431-432, 209 A.2d 829 (1965). In all respects, "the common and specialized experience and work-a-day knowledge of police [officers] must be taken into account." Id. at 431, 209 A.2d 829.
Against that backdrop, we are satisfied that the circumstances known to the detectives were such as to establish a reasonable belief that a crime was being committed in their presence. Initially, we note that the information received from the citizen informant that a disturbance relating to drugs had occurred at the Aristocrat Hotel clearly called for further investigation. Detective Thomas was not dealing with a tip received from a faceless and anonymous member of the criminal milieu, but rather from an ordinary citizen presumably having "no ties or connections with the underworld...." State v. Lakomy, 126 N.J. Super. 430, 435, 315 A.2d 46 (App.Div. 1974). "Consequently, an individual of this kind may [generally] be regarded as trustworthy and information imparted by [her] to a police [officer] concerning a criminal event would not especially entail further exploration or verification of [her] personal credibility or reliability before appropriate police action is undertaken." Ibid. In these circumstances, the officer would have been derelict in his duty had he failed to investigate.
The detective's suspicions were further aroused when he learned that there had been numerous telephone calls and "foot traffic" to and from Room 402. Moreover, the room was registered to defendant Alvarez, an individual known to the detective by reason of a prior drug investigation.
*567 The final piece of the mosaic was the conversation relating to drugs which the officers overheard from their vantage point in the hallway of the hotel, a place in which they had a right to be. Perhaps to the uninitiated or the layperson, this conversation could be given an innocent construction. However, the detectives, based upon their training and experience, understood that the defendants were discussing their success in selling the drugs in their possession and the need to obtain additional inventory for their trade.
Perhaps, no single circumstance was determinative of the prudence of the action taken by the detectives. Consideration of the various factors separately, which is defendant's thesis here, may show no one in itself sufficient. In combination, however, the test of probable cause was clearly satisfied.

IV.
Because the Law Division judge determined that the police officers lacked probable cause, he did not reach the issue whether the warrantless entry was justified by exigent circumstances. We now address that question.
It has been said that "physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed." United States v. United States Dist. Court, 407 U.S. 297, 313, 92 S.Ct. 2125, 2134, 32 L.Ed.2d 752, 764 (1972). Accordingly, it is well established that "searches and seizures inside a home without a warrant are presumptively unreasonable," Payton v. New York, 445 U.S. 573, 586, 100 S.Ct. 1371, 1380, 63 L.Ed.2d 639, 651 (1980), and hence "prohibited by the Fourth Amendment, absent probable cause and exigent circumstances." Welsh v. Wisconsin, 466 U.S. 740, 749, 104 S.Ct. 2091, 2097, 80 L.Ed.2d 732, 743 (1984).
Only recently, our Supreme Court in State v. Hutchins, 116 N.J. 457, 561 A.2d 1142 (1989) and State v. Lewis, 116 N.J. 477, 561 A.2d 1153 (1989), had occasion to consider the parameters of the exigent circumstances exception to the warrant requirements *568 as they apply to a private home. See also State v. Bolte, 115 N.J. 579, 560 A.2d 644 (1989), cert. den. ___ U.S. ___, 110 S.Ct. 330, 107 L.Ed.2d 320 (1989). We need not retread upon ground so exhaustively covered in those opinions. Synthesizing the existing authority in other jurisdictions, the Court considered these factors: (1) the degree of urgency involved and the amount of time necessary to obtain a warrant; (2) reasonable belief that the contraband is about to be removed; (3) the possibility of danger to police officers guarding the site of contraband while a search warrant is sought; (4) information indicating the possessors of the contraband are aware that the police are on their trail; (5) the ready destructibility of the contraband and the knowledge that efforts to dispose of narcotics and to escape are characteristic behavior of persons engaged in narcotics traffic; (6) the gravity of the offense involved; (7) the possibility that the suspect is armed; (8) the strength or weakness of the facts establishing probable cause, and (9) the time of the entry. See State v. Hutchins, 116 N.J. at 465-466, 561 A.2d 1142; State v. Lewis, 116 N.J. at 484, 561 A.2d 1153; see also United States v. Rubin, 474 F.2d 262, 268-269 (3rd Cir.1973), cert. den. 414 U.S. 833, 94 S.Ct. 173, 38 L.Ed.2d 68 (1973); Dorman v. United States, 435 F.2d 385, 392-393 (D.C. Cir.1970). Where, as here, removal as well as destruction of evidence is offered as an exigent circumstance, "a collateral issue is whether the physical character of the premises is conducive to effective surveillance, as an alternative to a warrantless entry, while a warrant is procured." State v. Lewis, 116 N.J. at 485, 561 A.2d 1153. Another factor is whether the exigent circumstance can properly be characterized as "police-created," and, if so, whether it arose "as a result of reasonable police investigative conduct intended to generate evidence of criminal activity." State v. Hutchins, 116 N.J. at 460, 561 A.2d 1142.
While these factors can be articulated with disarming ease, their application to a concrete factual pattern is not without difficulty. The issue is "highly fact-sensitive." State v. Lewis, *569 116 N.J. at 487, 561 A.2d 1153. Commonly a constitutional question involves no more than a value judgment upon a factual complex rather than an evident application of a precise rule of law. State v. Funicello, 60 N.J. 60, 72, 286 A.2d 55 (1972) (Weintraub, C.J., concurring). In making these judgments, our review must be in a commonsense and realistic fashion, taking into account that police officers are not constitutional lawyers and their decisions often cannot be the product of studied reflection. "Our function is not to second-guess police officers, but rather to establish guidelines within which objectively-reasonable police action can be sustained." State v. Lewis, 116 N.J. at 488, 561 A.2d 1153.
Ordinarily, we would remand the matter to the Law Division to resolve the pivotal issues that affect the justification for the warrantless entry  the existence of exigent circumstances and whether, if they existed, they were permissibly or impermissibly created by the police officers. See State v. Hutchins, 116 N.J. at 476-477, 561 A.2d 1142. Unfortunately, that remedy is unavailable to us because the Law Division judge is no longer on the bench. We perceive no double jeopardy consideration which would preclude us from ordering a new hearing. Id. at 477, 561 A.2d 1142. However, we are convinced that the better course is for us to exercise original jurisdiction and decide the questions presented. See R. 2:10-5.
Based upon our review of the record, we are convinced that the State met its heavy burden of establishing that exigent circumstances existed and that they were not impermissibly created by the police. It is obvious from our recitation of the factors cited in State v. Hutchins and State v. Lewis, that some apply and others do not. Nevertheless, we do not read these opinions as requiring a quantitative rather than a qualitative analysis of the factors listed.
Perhaps the most compelling circumstance present here is the degree of urgency involved. The point to be stressed in this regard is that the police were involved in an "immediate, *570 ongoing investigation" rather than a "planned" or "routine" search or arrest. United States v. Webster, 750 F.2d 307, 327 (5th Cir.1984), cert. den. sub nom. 471 U.S. 1106, 105 S.Ct. 2340, 85 L.Ed.2d 855 (1985). The simple and overriding fact is that the officers reacted immediately to information received from the citizen informant. They did not have probable cause to obtain a warrant until they overheard the occupants of Room 402 discussing the need to obtain more drugs. In our view, the "fluidity of [the] ongoing investigation of the distribution of narcotics [made] the obtaining of an adequate search warrant more difficult to time in the flow of events." United States v. Hultgren, 713 F.2d 79, 87 (5th Cir.1983).
Second, the police officers harbored the reasonable belief that the contraband was about to be removed. From the conversation overheard by the officers, they could reasonably conclude that most of the drugs had already been sold. While it is true that the police could have attempted to secure a warrant while awaiting the sale of the remainder of the drugs, such a course would pose serious risks. As we will note more fully, the hotel room was not conducive to further surveillance without the possibility of being detected. We know of no constitutional doctrine that would compel the officers to risk the possibility of being detected and the correlative danger to their safety in the event their investigation were to go awry. We acknowledge that there was no evidence suggesting that defendants might have reacted in a violent way had they discovered the presence of the detectives in the hallway. However, we would be short on realism were we to fail to note that police work is dangerous work.
Third, drugs and drug paraphernalia, by their very nature, can be rapidly secreted or destroyed. If detected by the occupants of the motel room, it was reasonably foreseeable that much, if not all, of the evidence would have been discarded or otherwise lost.
*571 Fourth, despite the Law Division judge's conclusion to the contrary, we regard the facts known to the police as strongly supporting a finding of probable cause. There existed "not merely the minimum of probable cause, that is requisite even when a warrant has been issued, but beyond that a clear showing of probable cause...." Dorman v. United States, 435 F.2d at 392.
Finally, we emphasize that we are concerned here with a hotel room, not a person's house. We recognize that the occupants of a hotel room are entitled to the protection of the Fourth Amendment. See Hoffa v. United States, 385 U.S. 293, 301, 87 S.Ct. 408, 413, 17 L.Ed.2d 374, 381 (1966). However, "the reasonable privacy expectations in a hotel room differ from those in a residence." United States v. Agapito, 620 F.2d 324, 331 (2nd Cir.1980), cert. den. 449 U.S. 834, 101 S.Ct. 107, 66 L.Ed.2d 40 (1980). "[D]espite the fact that an individual's Fourth Amendment rights do not evaporate when he rents a motel room, the extent of the privacy he is entitled to reasonably expect may very well diminish." United States v. Jackson, 588 F.2d 1046, 1052 (5th Cir.1979), cert. den. 442 U.S. 941, 99 S.Ct. 2882, 61 L.Ed.2d 310 (1979). Granted that a tenant has standing to protect the room he occupies, "there is nevertheless an element of public or shared property in motel surroundings that is entirely lacking in the enjoyment of one's home." Marullo v. United States, 328 F.2d 361, 363 (5th Cir.1964).
Beyond this, unlike a private home, the ability of police officers to secure or continue a surveillance of a hotel room poses peculiar risks, many of which we have identified. It bears repeating that the hotel was empty other than the room occupied by the defendants. The detectives had been told that there had been a great volume of "foot traffic" to and from the room. Had the officers remained in the hallway while awaiting a search warrant, the strong likelihood is that their presence would have been noticed.
*572 The exigencies we have cited were not "police created." Even if they were, the conduct of the officers was reasonably designed to uncover evidence of criminality. Under these circumstances, none of the policy concerns that undergird the exclusionary rule are applicable. We are convinced that the search of the hotel room and the resulting seizure of evidence did not violate the Fourth Amendment.
The order of the Law Division suppressing the evidence is accordingly reversed.