605 A.2d 1113

STATE OF NEW JERSEY, PLAINTIFF–RESPONDENT,
v. VIVIAN HENRY, DEFENDANT–APPELLANT.

Superior Court of New Jersey
Appellate Division

Submitted September 19, 1991—Decided April 6, 1992.

Before Judges GAULKIN, BRODY and LANDAU.

*Wilfredo Caraballo*, Public Defender, attorney for appellant (*William P. Robertson*, Designated Counsel, on the brief).

*Robert J. Del Tufo*, Attorney General, attorney for respondent (*Richard W. Berg*, Deputy Attorney General, of counsel).

The opinion of the court was delivered by

GAULKIN, P.J.A.D.

Following the denial of her motion to suppress, defendant pled guilty to second-degree conspiracy to violate the narcotics laws (*N.J.S.A.* 2C:5–2), second-degree possession of cocaine with intent to distribute (*N.J.S.A.* 2C:35–5b(2)), third-degree distribution of cocaine within 1000 feet of school property (*N.J.S.A.* 2C:35–7) and third-degree distribution of cocaine (*N.J.S.A.* 2C:35–5b(3)). The State waived any mandatory parole ineligibility term (*N.J.S.A.* 2C:35–12), agreed that the second-degree crimes would be sentenced as third-degree crimes (*N.J.S.A.* 2C:44–1f(2)) and recommended that defendant's custodial sentences aggregate not more than three years. In keeping with that agreement, the trial judge imposed concurrent three-year custodial sentences on all counts. Defendant now appeals from the judgment, challenging only the denial of her motion to suppress the evidence seized following her warrantless arrest in her home. The trial judge granted bail pending appeal.

I

The facts are undisputed. Detective Boswell, an undercover officer of the Newark Police Narcotics Bureau, was told by an informant that crack cocaine could be bought at 179 Norfolk Street, Apartment 1A. Boswell contacted his backup units and told them that he was going to try to make a buy. He went to the building and knocked on the door of apartment 1A. A woman later identified as defendant opened the door. About

five adults and two to four children were in the apartment. Boswell said to defendant, "let me get two," meaning that he wanted "two of whatever was available." Defendant told Boswell to see her son, later identified as Terrell Henry, who was also in the room. Boswell directed his request to Terrell, who asked for $20; Boswell handed over two $10 bills, the serial numbers of which he had previously recorded. Terrell turned to another woman in the room, later identified as Sharlene Wright, and told her to "get him two." Wright went to a side room and shortly returned with two vials of crack, which she gave to Boswell. Boswell then left the apartment, notified his backup units by radio that he made a buy and described the location and the three people involved. Boswell testified that he remained "in the area" while the backup units "went to that location to arrest those three people."

The backup units, consisting of five detectives, went to defendant's apartment to arrest the three persons described by Boswell. As described by Detective Schneider, making warrantless arrests following an undercover buy is departmental policy:

Q. Officer, after you received the report or the information from Detective Boswell that a buy had been made, did you or any of the other officers make any effort to obtain an arrest warrant?

A. No, this is an operation, buy and bust, this is what we do all the time. Once drugs are sold, I should say most of the time. Once drugs are sold the person who sells them are immediately arrested, as often as possible I should say.

Q. Now, is it your experience that when a buy and bust occurs the arrest is immediately effected, even if it involves going into someone's residence?

A. Yes.

Q. And is it also the policy from your experience that you go into this residence to make an arrest even though you don't have an arrest warrant?

A. Well, we do go into their residence once we know a crime has been committed to affect the arrest. Was your question an arrest warrant, did you say?

Q. Yes.

A. Okay.

Under those circumstances we don't need an arrest warrant, once a crime's committed we do have the right and are entitled to make that arrest.

The officers came to defendant's door and knocked. When defendant opened the door, the officers immediately identified themselves as police. Upon seeing them, Wright ran into a side bedroom "with [two of the detectives] pursuing her." Schneider concluded that defendant was one of the persons described by Boswell and arrested her. Terrell, at a kitchen table, was also identified as one of the persons described by Boswell and he too was arrested. The two detectives who had followed Wright into the bedroom saw her trying to hide a large package, later found to contain 116 vials of crack, under the mattress; the package was seized and Wright was arrested. The officers seized from Terrell the two $10 bills Boswell had given him; while transporting Wright to the police station, they recovered four crack vials she tried to discard in the rear of the police car.

After their indictment, defendant, Terrell and Wright jointly moved to suppress all of the seized evidence. In denying the motions, the judge found that Boswell's crack purchase gave the officers the right "to effect lawful arrests upon probable cause" and that the police did nothing that "went beyond the bounds of what's permitted in effecting an arrest on probable cause without a warrant." As the judge viewed it, there was "nothing other than a knock on the door and the expected response to that knock." Wright's running into the side bedroom "created exigent circumstances," *i.e.*, the possibility that she was going to destroy the crack inventory or that the safety of the officers was at risk. That justified the seizure of the 116 vials; the seizures of the $10 bills and the four vials in the police car were lawful incidents to the arrests of Terrell and Wright.

## II

We conclude that the warrantless entry, arrests and seizures were unlawful. The core principles were stated by our Su-

preme Court in *State v. Hutchins,* 116 *N.J.* 457, 462–463, 561 *A.*2d 1142 (1989):

As the United States Supreme Court has acknowledged, "physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed." *United States v. United States Dist. Court,* 407 *U.S.* 297, 313, 92 *S.Ct.* 2125, 2134, 32 *L.Ed.*2d 752, 764 (1972). Accordingly, it is well established that "searches and seizures inside a home without a warrant are presumptively unreasonable," *Payton v. New York,* 445 *U.S.* 573, 586, 100 *S.Ct.* 1371, 1380, 63 *L.Ed.*2d 639, 651 (1980), and hence "prohibited by the Fourth Amendment, absent probable cause and exigent circumstances." *Welsh v. Wisconsin,* 466 *U.S.* 740, 749, 104 *S.Ct.* 2091, 2097, 80 *L.Ed.*2d 732, 743 (1984).

*See also State v. Lewis,* 116 *N.J.* 477, 483, 561 *A.*2d 1153 (1989); *State v. Bolte,* 115 *N.J.* 579, 585, 560 *A.*2d 644, *cert. denied,* 493 *U.S.* 936, 110 *S.Ct.* 330, 107 *L.Ed.*2d 320 (1989).

In *State v. Alvarez,* 238 *N.J.Super.* 560, 568, 570 *A.*2d 459 (App.Div.1990), we offered the following synthesis of the case law identifying factors relevant to the determination of exigent circumstances:

(1) the degree of urgency involved and the amount of time necessary to obtain a warrant; (2) reasonable belief that the contraband is about to be removed; (3) the possibility of danger to police officers guarding the site of contraband while a search warrant is sought; (4) information indicating the possessors of the contraband are aware that the police are on their trail; (5) the ready destructibility of the contraband and the knowledge that efforts to dispose of narcotics and to escape are characteristic behavior of persons engaged in narcotics traffic; (6) the gravity of the offense involved; (7) the possibility that the suspect is armed; (8) the strength or weakness of the facts establishing probable cause; and (9) the time of the entry.

*See also Hutchins,* 116 *N.J.* at 465, 561 *A.*2d 1142 (quoting a comparable listing of factors set forth in *Dorman v. United States,* 435 *F.*2d 385, 392–393 (D.C.Cir.1970)). Application of those factors, of course, is "not without difficulty" (*Alvarez,* 238 *N.J.Super.* at 568, 570 *A.*2d 459), for the issue is "highly fact-sensitive" (*Lewis,* 116 *N.J.* at 487, 561 *A.*2d 1153). Our review, moreover, must be undertaken "in a commonsense and realistic fashion" (*Alvarez,* 238 *N.J.Super.* at 569, 570 *A.*2d 459), "not to second-guess police officers, but rather to establish guidelines within which objectively-reasonable police action can be sustained" (*Lewis,* 116 *N.J.* at 488, 561 *A.*2d 1153).

We start with the recognition that Boswell's purchase of the drugs provided "a clear showing of probable cause." *Compare Lewis*, 116 *N.J.* at 487, 561 *A.*2d 1153. But once Boswell had left the apartment, the circumstances did not bespeak any significant exigency, nor did the police witnesses claim any. The buy was made in Newark early on a Wednesday afternoon, when a warrant could readily have been obtained. There was no indication that the contraband was about to be removed or exhausted in sales or use. The record does not suggest that the police could not have set up a surveillance to prevent flight from the building. Nor is there any indication that the police would be in danger if they guarded the site while a warrant was sought, or that the occupants of the apartment were aware that the police were on their trail, or that they were armed or that they were planning to depart. And there is no indication that the drug operation was of great magnitude.

The circumstances, in short, were much like those relied on by the Supreme Court to invalidate the warrantless entry in *Lewis*. There a reliable informant told the police that he had observed narcotics in defendant's apartment, that other people were in the apartment, that one had a gun, that they were packaging drugs for distribution and that the police should act as soon as possible because the occupants were preparing to leave. When the officers went to the apartment and knocked, defendant opened the door, saw a uniformed officer and attempted to close the door. The officer stuck his foot in the door to keep it open and was able to see suspected contraband on the kitchen table. The police then entered the apartment and made the arrest and seizures.

The Supreme Court found no sufficient exigent circumstances for the warrantless entry. The Court noted that the magnitude of the drug operation was not shown, that a warrant could have been quickly and readily available, that the police could have maintained surveillance and that there was "no evidence in the record to suggest that the premises could not have been safely secured while one of the officers obtained a

search warrant." *Id.* at 487–488, 561 *A.*2d 1153. Accordingly, the Court concluded, "[s]urveillance of these premises for a limited time period to prevent removal of the drugs while a warrant was obtained was clearly the appropriate police procedure." *Id.* at 488, 561 *A.*2d 1153.

The State does not argue that any exigent circumstances existed before Boswell's back-up units came to the door of defendant's apartment. Rather, the State contends that the police properly went to the apartment "to make the arrest" and exigent circumstances arose when the door of the apartment was opened in response to the officer's knock. Upon seeing four or five adults in the apartment and Wright's flight to a back bedroom, the police "could reasonably be concerned for their safety" and for "the possible destruction of evidence."

In our view, that kind of police-created exigency cannot justify a warrantless entry. The reason is succinctly stated by Professor LaFave:

> Of course, if the circumstances are such that the police should have an arrest warrant in hand already, then they may not contend that by going to the premises without a warrant and alerting the occupants of their presence, there have thereby arisen exigent circumstances necessitating a warrantless entry to protect against the loss of evidence. "To approve the consequences of such an arrest would render Fourth Amendment protections vulnerable to possibly even more imaginative government-created exigencies and quickly render the warrant requirement a nullity." *People v. Wilson,* 86 *Ill.App.*3d 637, 42 *Ill.Dec.* 279, 408 *N.E.*2d 988 (1980).

2 Wayne R. LaFave, *Search and Seizure* § 6.1(f), at 604 n. 174 (2d ed. 1987).

This is not a case like *Alvarez,* in which we upheld the warrantless entry of the hotel room because "the police were involved in an 'immediate, ongoing investigation' rather than a 'planned' or 'routine' search or arrest." 238 *N.J.Super.* at 569–570, 570 *A.*2d 459 (quoting *United States v. Webster,* 750 *F.*2d 307, 327 (5th Cir.1984), *cert. denied,* 471 *U.S.* 1106, 105 *S.Ct.* 2340, 85 *L.Ed.*2d 855 (1985)). *See also Hutchins,* 116 *N.J.* at 468–473, 561 *A.*2d 1142; 2 LaFave, § 6.1(f) at 600–602. Detective Schneider's testimony makes clear that the arrest here was both planned and routine: warrantless arrests following under-

cover buys are "what we do all the time" because "[u]nder those circumstances we don't need an arrest warrant, once a crime's committed we do have the right and are entitled to make that arrest."

Judge (now Justice) Stevens reviewed a similar arrest in *United States v. Rosselli*, 506 *F*.2d 627 (7th Cir.1974). Government agents had seized a quantity of marijuana under circumstances which gave them probable cause to believe that defendant possessed contraband in his apartment. Within ten or fifteen minutes, the agents arrived at defendant's apartment, knocked on the door and called, "It's the police, we want to talk to you." When they heard scuffling movements, footsteps running to the rear of the apartment and a voice calling, "Don't open the door for anybody," the agents kicked down the door, entered, arrested defendant and seized marijuana found in the apartment.

Rejecting the government's argument that exigent circumstances justified the entry, Judge Stevens found it "appropriate to appraise the agents' conduct during the entire period after they had a right to obtain a warrant and not merely from the moment when they knocked at the front door." *Id.* at 630. The record did not adequately explain "why no attempt to obtain a warrant was made, or why no consideration was given to placing the defendant's apartment under surveillance while an attempt to secure a warrant was being made." *Id.* Even though "the emergency which did develop" was not "contrived by the agents," who "had a right to pursue their investigation by seeking voluntary cooperation from the suspect," the court nevertheless found that "the emergency which did ensue was foreseeable."

> Moreover, this type of situation may reoccur repeatedly and might lend itself to too easy a by-pass of the constitutional requirement that probable cause should generally be assessed by a neutral and detached magistrate before the citizen's privacy is invaded.

*Id.*

*United States v. Munoz–Guerra*, 788 *F*.2d 295 (5th Cir.1986), states a similar holding. Relying on an anonymous tip, police

officers and agents went to defendant's condominium and, looking through a window, saw the butt of a marijuana cigarette, a bag containing white powder and a box in which scales are customarily packed. When the agents knocked on the glass patio door, the defendant appeared, and the agents ordered him to open the door. The door was locked and defendant indicated he would go get a key. Believing that he might get a weapon or attempt to destroy evidence, the agents kicked in the door, entered the condominium, conducted a security search and seized a large quantity of drugs and two handguns.

The court assumed, without finding, that the agents' observations through the window gave them probable cause to search, but that the warrantless entry was not justified. The court refused to focus solely on the circumstances confronting the agents after they made their presence known. The dispositive question, the court stated, was "whether exigent circumstances justified the agents' initial decision to approach the patio door." *Id.* at 298. The court answered that question:

> In the instant case, it was possible to secure the condominium covertly from the outside. There was no basis, on these facts, for believing that resort to a magistrate would have created risks of a greater magnitude than those which are present in any case where the police have probable cause but delay entry pending receipt of a warrant. Had the police's necessary efforts to secure the premises been visible to the inhabitants or had there been reason to believe that someone within the condominium was in need of immediate succor, the government's position would have merit. The government's argument that swift and immediate action may have minimized risks to human life and physical evidence, however, misses the mark. Our fourth amendment jurisprudence contemplates that protection of individual rights of privacy will be achieved at some cost to society's interest in public safety; and, in the ordinary case the risk that a criminal suspect will become aware of covert surveillance is deemed insignificant in contrast to the more substantial benefits we all derive from the procedural safeguards of judicial process.

*Id.* at 298–299. Other courts have invalidated warrantless entries for similar reasons. *See, e.g., United States v. Beltran,* 917 *F.*2d 641, 643 (1st Cir.1990) (warrantless entry to make narcotics arrest unlawful "where the police fully expect that they may have to enter a home to make an arrest in the near future, and when they have more than enough time and knowl-

edge to secure a warrant"); *State v. Santana*, 133 *N.H.* 798, 586 *A.*2d 77, 82 (1991) (warrantless entry unlawful where "the exigency was not just foreseeable but was the *expected* result of the planned drug buy"); *People v. Wilson*, 86 *Ill.App.*3d 637, 42 *Ill.Dec.* 279, 282, 408 *N.E.*2d 988, 991 (1988) (warrantless entry into hotel room unlawful because "no exigent circumstances existed ... except those improperly created by the officers themselves" by knocking on the door and making their presence known).

We recognize that other cases have taken a different view. One recent example, *United States v. MacDonald*, 916 *F.*2d 766 (2nd Cir.1990), *cert. denied*, —— *U.S.* ——, 112 *S.Ct.* 1071, 111 *L.Ed.*2d 1177 (1991), involved a "buy-bust" operation much like the one that occurred here. Based on an informant's tip about a narcotics distribution operation, an undercover agent went to an apartment and purchased marijuana. He saw six persons there, with at least two guns and a large quantity of what appeared to be marijuana and cocaine. Ten minutes after he left, the agent returned with reinforcements. When they knocked on the door and identified themselves, they heard the sounds of shuffling feet and learned from a radio communication that occupants of the apartment were attempting to escape through a window. The agents then used a battering ram to gain entry, whereupon they arrested five men and seized the weapons and narcotics.

A majority of the Court of Appeals, sitting *in banc*, first found that exigent circumstances were present "once the undercover agent had firsthand knowledge of the suspects' undertakings inside the apartment." *Id.* at 770.[1] Furthermore, since the undercover agent would have been entitled to make an arrest at the time of his purchase, he "did not need a warrant to

---

[1] The court's analysis leading to that conclusion reflects an attitude quite different from that of our Supreme Court in *Lewis*. In any event, the State here does not contend that any exigency existed before the police knocked on the door and identified themselves.

reenter the apartment within ten minutes, having exited only to secure proper protection by obtaining reinforcements." *Id.* at 771. However, the court held that even if no exigency existed before the agents announced themselves, their doing so was a lawful attempt to gain "peaceful entry"; while the suspects' response "may reasonably be expected," the resultant exigent circumstances need not be disregarded. *Id.*

Judge Kearse, joined by Chief Judge Oakes and Judge Feinberg, dissented. They found that exigent circumstances arose only when the agents returned to the apartment and announced their official presence. Judge Kearse urged that such police-created exigencies should not validate a warrantless entry:

It was not objectively reasonable for the officers to hold any belief that suspects who took such precautions during an apparently innocuous buy would voluntarily consent to a search by law enforcement officers. Since the agents' suggestion that they returned because they thought they could gain entrance to search by consent defies credulity, and since the agents plainly anticipated that the announcement of their identity would precipitate an exigency, for they came armed with a battering ram, I think the agents must be regarded as having deliberately created the exigency precisely to justify their warrantless entry. We should not endorse such contrivances by law enforcement officials in their efforts to circumvent the Fourth Amendment's warrant requirement.

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

The majority's ruling today gives law enforcement officers broad license to enter premises without a warrant. Apparently, they need no more than to have probable cause for belief that there is ongoing narcotics trafficking within and to request entry; if they hear any sounds in response other than the purest of verbal refusals, they can justify a warrantless entry by their fear that evidence will be destroyed or that suspects will escape. Indeed, it appears that the majority would allow the agents to enter simply on the basis that one agent had recently been on the premises by consent and witnessed the trafficking. After this decision there appears to be little left of the warrant requirement in narcotics cases.

*Id.* at 776–777.

We find the view expressed by Judge Kearse and in the cases we have earlier discussed to be preferable and more in keeping with the New Jersey precedents liberally protecting against unreasonable searches and seizures. *See, e.g., State v. Hempele,* 120 *N.J.* 182, 195, 576 *A.*2d 793 (1990); *State v. Novembrino,* 105 *N.J.* 95, 145, 519 *A.*2d 820 (1987); *State v. Hunt,* 91 *N.J.*

338, 344–346, 450 *A*.2d 952 (1982); *State v. Alston*, 88 *N.J.* 211, 225, 440 *A*.2d 1311 (1981); *State v. Johnson*, 68 *N.J.* 349, 353, 346 *A*.2d 66 (1975). We are unpersuaded by the suggestion advanced by our dissenting colleague that a "buy-bust" operation, by its very nature, betokens exigency and that an immediate warrantless reentry is thus appropriate police action. In the words of then-Judge Stevens, that is "too easy a by-pass of the constitutional requirement." *Rosselli*, 506 *F*.2d at 630.

The denial of the motion to suppress and the ensuing conviction are reversed.

LANDAU, J.A.D., dissenting.

This "buy and bust" operation, initiated after an informant's tip, took place during daylight hours at an apartment where people came and went to buy drugs on Norfolk Street, Newark; not in the dark on a quiet Sussex country lane. I cannot imagine where a five-person "bust" team reasonably could be expected both to maintain surveillance and remain undetected while a team member secured an arrest or search warrant.

Here, we know that a lawful warrantless arrest could have been made upon personal knowledge by the undercover officer when he made the buy. (*N.J.S.A.* 40A:14–152.1). When outnumbered and necessarily uncertain of the extent to which arms are available to the occupants, it is objectively reasonable, in my view, for such an undercover officer to convey to a larger back-up unit confirmation of the buy with marked money, and the identification of the participants, leaving the job of immediate arrest to that unit.

The arrest team in this case possessed more than mere probable cause, but a degree of awareness of the crime and the criminals which approached certainty. *Compare, Dorman v. United States*, 435 *F*.2d 385, 392–93 (D.C.Cir.1970). Moreover, it is undisputed that the team knocked on the apartment door, and identified themselves when it was opened, for the purpose of making arrests. The flight of the identified participants and

the observed concealment efforts, did not constitute the kind of police-created exigency which occurs when the police, possessing merely information of uncertain reliability, precipitate flight and consequent exigency by announcing their presence, and then search without a warrant. I do not believe that the police conduct here was objectively unreasonable within the standards considered in *State v. Hutchins*, 116 *N.J.* 457, 476, 561 *A.*2d 1142 (1989); *State v. Lewis*, 116 *N.J.* 477, 487–88, 561 *A.*2d 1153 (1989); *State v. Bolte*, 115 *N.J.* 579, 585–92, 560 *A.*2d 644 (1989), or *State v. Alvarez*, 238 *N.J.Super.* 560, 567–571, 570 *A.*2d 459 (App.Div.1991).

The majority says that the record falls short of showing that there was any danger that the occupants were armed, or of risk of detection or difficulty in surveillance. However, we have previously taken notice of the dangers inherent in this kind of police work as well as reasonable foreseeability of the ability to rapidly secrete or destroy drug contraband. *See, e.g., Alvarez, supra*, 238 *N.J.Super.* at 570, 570 *A.*2d 459. I submit that the very format of this buy-bust team demonstrated police recognition that in the current violent drug environment it was not safe for the officer who made the buy to try to secure an entire apartment and make multiple arrests in the face of the unknown. I would not second-guess that evident decision nor insist upon further proof to accept its basis. As to the asserted lack of a record to show risks of detection, destruction, and physical danger, these are so palpably present here, whether articulated by a police witness or not, that I do not deem material the absence of those magic words from the record. *See Alvarez, supra*, 238 *N.J.Super.* at 570, 570 *A.*2d 459. At most, were this a prime concern, a remand for fuller exploration of this issue should be the remedy, not a reversal.

Of course, the arrests, and seizures made incident to those arrests as the result of observations made when the participants created an exigency, must meet the "objectively reasonable" test. *State v. Bruzzese*, 94 *N.J.* 210, 463 *A.*2d 320 (1983). If the team had waited for a day or even an hour without

seeking a warrant, I readily concede that this would not have been reasonable. But they moved immediately, and for the unmistakable purpose of arrest.

It is important to remember that the evidence of distribution had already been secured. I consider this to be highly relevant on the issue of the State's burden to show that the teams' announcement of police identity was done for purpose of effecting lawful arrests, and not for the purpose of precipitating an exigency to allow a search of the apartment.

The facts in this case do not present a forced entry into a residence for purposes of arrest, which concerned the Supreme Court in *Payton v. New York*, 445 *U.S.* 573, 100 *S.Ct.* 1371, 63 *L.Ed.*2d 639 (1980). We have an entry precipitated by exigent circumstances which occurred only after the door was opened in response to the police knock and subsequent police identification for the purpose of arresting the described participants. The trial judge believed this. The record supports it.

Thus, the arrests and seizure survive analysis under *Payton.*[1] Interestingly, even absent *bona fide* exigent circumstances, this entry complied with the four strict common law historical restrictions upon entries to arrest: (1) serious crime; (2) knock and announcement; (3) daytime knock and entry; and (4) stringent probable cause. *Payton, supra,* 445 *U.S.* at 616–17, 100 *S.Ct.* at 1395–96 (White, J. dissenting). *See also U.S. v. Mac-Donald,* 916 *F.*2d 766 (2d Cir.1990) *cert. den.* —— *U.S.* ——, 111 *S.Ct.* 1071, 112 *L.Ed.*2d 1177 (1991), in which, as the majority opinion has pointed out, the Second Circuit *en banc* upheld fruits of a *forced* entry for purposes of an arrest without

---

[1]The majority refers to Detective Schneider's testimony respecting a questionable departmental policy which implied that entries of residences for arrest purposes were routinely made without warrant, irrespective of exigency. That hypothetical scenario did not form the subject of the trial judge's findings. My colleagues have, I believe, given too little weight to the present facts and undue weight to the purported policy, which we need not address, except by way of disapproval.

warrant minutes after an undercover agent's drug buy, utilizing the *Dorman* factors cited in *Hutchins, supra,* 116 *N.J.* at 465, 561 *A.*2d 1142. In the present case, four of the six *Dorman* factors were clearly involved.[2]

I would conclude that the police conduct here was the kind of reasonable police activity contemplated by *Hutchins,* well within the standards of *Payton,* and objectively reasonable under *Bruzzese.* Accordingly, I respectfully dissent.

---

[2](1) Clear showing of probable cause to believe suspect committed crime (here, the showing approached certainty); (2) strong reason to believe the suspect is in premises to be entered; (3) likelihood that suspect will escape (here flight efforts and attempts to conceal evidence had commenced); and (4) peaceful circumstances of the entry. *See, Dorman, supra,* 435 *F.*2d at 392–93. As recognized in *MacDonald,* sometimes a solitary factor will be deemed to suffice and sometimes a combination of several. The list is but a sampling of the kinds of considerations deemed relevant to support the exigency contention. *See Alvarez, supra,* 238 *N.J.Super.* at 568, 570 *A.*2d 459.